(No. 74855.

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lant, v. GREGORIO CARDONA, Appellee.

*Opinion filed March 24, 1994.*

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Kathleen Bom, Assistant State's Attorneys, of counsel), for the People.

Rita A. Fry, Public Defender, of Chicago (Elyse Krug Miller, Assistant Public Defender, of counsel), for appellee.

JUSTICE HARRISON delivered the opinion of the court:

The defendant, Gregorio Cardona, was indicted in the circuit court of Cook County on three counts of murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1) through (a)(3)), based on the death of Raymond Carvis by stabbing, which occurred during a residential burglary for which defendant was also indicted (Ill. Rev. Stat. 1985, ch. 38, par. 19—3(a)). Instructed as to accountability, the jury returned a general verdict of guilty on all three counts of murder and a verdict of guilty on the count of residential burglary. The trial court entered judgment on all three counts of murder and sentenced defendant on "Count 4, the offense of murder," to a term of imprisonment of 40 years. Declaring that the judgments on counts I and II, which pertain to intentional and to knowing murder, respectively, were merged in the judgment on count IV, which pertains to felony mur-

der, the court imposed no sentence on counts I and II. The court sentenced defendant to a consecutive term of imprisonment of 15 years on the count pertaining to residential burglary.

Upon defendant's appeal (240 Ill. App. 3d 110), the appellate court affirmed his conviction for felony murder and the sentence imposed thereon, concluding that the trial court properly inferred from the jury's verdict the jury's intention to convict defendant of felony murder. The appellate court concluded further, however, that the verdict could not support an inference that the jury found defendant guilty of intentional murder and, therefore, vacated the conviction on that count. The appellate court determined as well that residential burglary is a lesser included offense of felony murder and, thus, vacated the defendant's conviction of residential burglary. Pursuant to Supreme Court Rule 315 (134 Ill. 2d R. 315), we granted the State leave to appeal. As petitioner, the State contends that the appellate court erred in holding, first, that the general verdict returned by the jury cannot support a conviction for intentional murder and, second, that the predicate offense is a lesser included offense of felony murder.

At trial the evidence established that on June 23, 1987, Raymond Carvis was stabbed a total of 37 times, possibly with two knives. The medical examiner described 15 of the wounds as deep and had found upon X-ray that a portion of a knife blade was lodged in one side of the victim's neck. The body of the victim was discovered in his home with its arms bound by a necktie behind the back just above the elbows. A pair of socks, tied together, had, in turn, been tied around the victim's neck. The victim's dwelling had been ransacked, and a number of items of personal property were missing, including jewelry and electronic equipment.

Among the State's witnesses were Fernando Gomez

and Lowell Higgins Bey, two of the six persons present when these offenses were committed. Fernando Gomez testified that on June 22, 1987, he had met with four other persons, including the defendant, and had discussed "making some money." According to the witness, the next day they decided to "do a burglary" "[s]omewhere in the neighborhood." The witness stated that Harry Rodriguez, Michael McCastle, Roberto Cardona, who is the defendant's brother, and the witness himself had rushed into the victim's home, McCastle seizing the victim by the neck, Roberto Cardona seizing him by the legs, and Rodriguez seizing him by the waist. The three took the victim upstairs, as the witness followed.

While the victim struggled as the three tried to hold him down, Gomez entered two of the upstairs rooms "[l]ooking for things to take." As he did so, he said, he kept "peeking out" and saw the three "wrestling" with the victim. After about 15 minutes, he heard "a yell, like a scream or something. So, I came out of that room and I like jogged across. And I seen [Lowell Higgins Bey] at the top steps. And I went towards the man and hit him once or twice." After striking the victim, the witness testified, "I left him alone. I pulled like towards the side and [defendant] came out of no where [sic] and started hitting on the man too." When defendant struck the victim, McCastle still held the victim by the neck, and Rodriguez and defendant's brother held him down. Then, Gomez said, Rodriguez "reached down his back pocket and came out with a knife. He goes, 'Watch this.' He swung, stabbed the guy one time in the stomach." Thereafter, while the victim still struggled with his assailants, the witness returned to one of the upstairs rooms for about 15 minutes. The defendant and his brother followed. While there the witness heard Rodriguez say, "Get something to tie this motherfucker up." According to Gomez, defendant then obtained a "tie"

and "took it to where that was happening at. He gave it to Harry Rodriguez," who bound the victim. At this time, the witness said, the victim had been stabbed once and was "moaning and groaning and all that."

The witness testified that shortly thereafter he left the victim's residence, leaving defendant and three of the other assailants there. He indicated that when he left the residence, the victim was still alive. After stopping on a street corner at the end of the block on which the victim's house was located, the witness saw defendant "running out." Thereafter McCastle emerged from the house, followed a few minutes later by defendant's brother, who was carrying objects which he put into an automobile. Defendant's brother reentered the house and later reemerged carrying other items that he put in the trunk of the automobile. Gomez then went home. The next day Rodriguez gave him $300.

He testified further that under the terms of the agreement he had reached with the State, if he told the truth in the cases of Harry Rodriguez, Michael McCastle, Roberto Cardona, and this defendant, he would receive a sentence of four years; otherwise, he would be tried for murder. He testified to a number of discrepancies between his testimony at trial and the account of this incident he had given to police in a statement made following his arrest. In his statement to police Gomez indicated that Higgins Bey had kicked the victim "all over" and that the six had rushed into the house all together once the victim had opened the front door. The witness testified at trial that he had said this of Higgins Bey at that time because "when they arrested me, they mentioned [Higgins Bey] had said something about me; got me involved." He stated that he had also "tried to throw the officers off a little." At trial the witness testified that defendant and Higgins Bey had not gone in the front door of the house with him and the three

others but had gone up the alley to the back of the house instead.

During cross-examination the witness testified that Rodriguez had called for something with which to tie the victim, that defendant had brought a tie from another room and had given it to Rodriguez, that Rodriguez had tied the victim with it, and that Rodriguez had then stabbed the victim. Gomez maintained that he had seen Rodriguez stab the victim only once, whereupon the witness "freaked out" because "[w]e were there for a burglary." Sometime later, he said, he left the house alone. He had told police in his statement to them that he, defendant, and defendant's brother had run out of the house together.

The second of these two witnesses, Lowell Higgins Bey, testified that as the six approached the victim's residence, Rodriguez told him and defendant to go down an alley while the others continued walking up the street. Later Rodriguez signalled for the two to come up to the victim's house. They did so, entering by the back door. Proceeding upstairs, they found that McCastle "had the man by the neck, holding him in a head lock." Roberto Cardona began to strike the victim, as did Rodriguez. Gomez ran past the witness, and defendant pushed the witness aside "and went over there and hit the man himself. Rodriguez pulled his knife out and stabbed the man." Thereafter, Higgins Bey "just looked for a minute, and *** went back down the stairs and back out the back door." That night, he said, McCastle gave him $200. Higgins Bey described the agreement he had reached with the State, the terms of which are the same as the agreement between the State and Fernando Gomez. As occurred in the testimony of Gomez, there were differences between the testimony of this witness and the statement he had given to police the day he was arrested. The differences in this instance took the form, often, of omissions in the statement given to police.

The statement given by the defendant to police following his arrest was read to the jury. In it defendant said that he had entered the victim's house with Lowell Higgins Bey in order to obtain a VCR and that when they did so his brother, Harry Rodriguez, Michael McCastle, and Fernando Gomez were already there. When defendant got to the top of the stairs, "[McCastle] had the man by his neck." Defendant said that Rodriguez "flipped out" a knife and stabbed the victim. He indicated in the statement that when Rodriguez pulled out the knife, defendant turned and noticed that his brother had already left. He stated further that he had not seen how many times Rodriguez stabbed the victim, adding, "I seen him stab him once, and I saw his arm swing again. And I turned my face and walked out."

Testifying at trial in his own behalf, defendant, who was 16 years old at the time of these offenses, stated that on the afternoon when the offenses were committed he had accompanied a friend to juvenile court. This person, who appears to have been a complaining witness in juvenile proceedings, did not testify. Nor did a third person whom defendant named and described as having driven the two to those proceedings. Defendant testified that what he had said in the statement to police was untrue; he denied having entered the victim's house with the intent to steal, having observed McCastle hold the victim around the neck, having witnessed the stabbing of the victim at any time, having obtained a tie, and having given one to Rodriguez to secure the victim. Defendant indicated that although he had not been involved in or present during the commission of these offenses, he had made the statement to police on the advice of his brother and essentially had repeated in the statement what his brother had told him to say, after which, his brother had assured him, the police would release him and he could return home.

During its deliberations the jury sent two notes asking the following questions, as read into the record by the court: (1) "If we find the defendant guilty of—and then the word, murder, is started and crossed off and then the word, residential burglary, do we automatically find him guilty of murder?" and (2) "Please explain the law of accountability and how it pertains to first proposition, I believe the word is to sustain the charge of murder." Although the State wished to have the first question answered in the affirmative and the defendant wished to have it answered in the negative, the circuit court, after discussion with counsel, gave the jury the following answer: "Please read the instructions carefully, they should answer your questions." Thereafter the jury reached its verdicts, following the announcement of which the jury was polled, each member responding in the affirmative.

A general finding of guilty is presumed to be based on any good count in the indictment to which the proof is applicable. (*People v. Lymore* (1962), 25 Ill. 2d 305, 307-08.) It is well established in Illinois that where an indictment contains several counts arising out of a single transaction and a general verdict is returned, the effect is that the defendant is guilty as charged in each count to which the proof is applicable. *People v. Scott* (1992), 148 Ill. 2d 479, 555; *People v. Thompkins* (1988), 121 Ill. 2d 401, 455-56; *Lymore,* 25 Ill. 2d at 308.

Where but one person has been murdered, there can be but one conviction of murder; when multiple convictions are obtained for offenses arising out of a single act, sentence is imposed on the most serious offense. (*People v. Lego* (1987), 116 Ill. 2d 323, 344.) Under such circumstances only the conviction for the most serious charge of murder will be upheld, and the convictions on the less serious charges of murder are to be vacated. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 377-78; *People v.*

*Guest* (1986), 115 Ill. 2d 72, 103-04.) A killing that occurs when acts are performed with the intent to kill or to do great bodily harm involves a more culpable mental state than does either a killing that occurs when acts are performed with the knowledge that they create a strong probability of death or great bodily harm or a killing that occurs in the course of a felony. (See *Pitsonbarger*, 142 Ill. 2d at 378.) Where charges of intentional, knowing, and felony murder have been proved, intentional murder is deemed to be the most serious offense. *Guest*, 115 Ill. 2d at 104.

Concerning the matter of when accountability exists, section 5—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 5—2) provides in relevant part as follows:

"5—2. *** A person is legally accountable for the conduct of another when:

* * *

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

Here there was evidence before the trier of fact that the defendant struck the victim while three other persons, including Harry Rodriguez, held him down; that thereafter Rodriguez stabbed the victim in the stomach; that Rodriguez subsequently asked for something with which to tie the victim; that defendant responded by finding and giving Rodriguez a tie, which Rodriguez used to bind the moaning and groaning victim; and that the victim's body was discovered so bound. There was sufficient evidence presented by which the trier of fact could, under a theory of accountability, convict defendant of the offense of murder committed with the intent to kill or to do great bodily harm.

Defendant contends that under the facts of this case

the circuit court properly inferred from the verdict that, of the three counts of murder with which he was charged, the jury intended to convict him of only the count alleging felony murder. In this regard defendant ascribes particular significance to the jury's note sent during its deliberations, in which it inquired whether it should "automatically" find defendant guilty of murder if it found him guilty of residential burglary. Defendant states further that after receiving the circuit court's response to the jury's question directing it to follow the instructions it had been given, the jury "promptly" returned its verdicts. However, there is nothing in the record to indicate when during the course of its deliberations the jury sent this inquiry or how much time elapsed between the circuit court's response to the inquiry and the jury's announcement of its verdicts. More importantly, the jury's question does not necessarily suggest a belief that the defendant was not guilty of intentional murder under a theory of accountability. In short, defendant's argument with respect to the significance of the jury's note is founded upon nothing more than speculation, in which we decline to engage. See *People v. Joe* (1991), 207 Ill. App. 3d 1079, 1083.

We note that defense counsel neither objected to the submission of the general verdict forms nor tendered alternative verdict forms requiring the jury to find him guilty or not guilty of intentional, knowing, and felony murder. We affirm the defendant's conviction for intentional murder and vacate the defendant's convictions for knowing murder and felony murder; we reverse the appellate court's affirmance of defendant's conviction for felony murder and its vacating of his conviction for intentional murder.

In light of our holding concerning the first point relied upon by the State, we need not consider the other point upon which the State relies for reversal, whether

residential burglary is a lesser included offense of felony murder, because residential burglary cannot be considered a lesser included offense of intentional murder. Accordingly, we reverse the appellate court's vacating of defendant's conviction for residential burglary.

Because the circuit court imposed sentence upon the conviction for felony murder, which is now vacated, we vacate that sentence together with the appellate court's affirmance of it. Since we must remand for resentencing upon the defendant's conviction for intentional murder and since the considerations of the circuit court might be different when imposing sentence for intentional murder coupled with residential burglary than they were when imposing sentence for felony murder and residential burglary, we remand this cause for resentencing upon his convictions for both intentional murder and residential burglary. (See *People v. Johnson* (1981), 102 Ill. App. 3d 122, 130.) Although the defendant has raised, by way of a request for cross-relief, a number of issues related to sentencing, because we are remanding the cause for resentencing on both of these convictions, we do not consider them.

In summary, for the reasons stated herein the defendant's conviction for intentional murder is affirmed, his convictions for knowing and felony murder are vacated, the sentences imposed upon the convictions for felony murder and residential burglary are vacated, and the cause is remanded to the circuit court for resentencing upon the convictions for intentional murder and residential burglary.

*Appellate court reversed in part and vacated in part;*
*circuit court affirmed in part and vacated in part;*
*cause remanded.*