THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTOINE OLLIE, Defendant-Appellant.

First District (3rd Division)    No. 1—00—1311

Opinion filed September 18, 2002.

Michael J. Pelletier and Rachel Rouse, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Peter Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HOFFMAN delivered the opinion of the court[1]:

Following a jury trial, the defendant, Antoine Ollie, was convicted of first degree murder and home invasion. The trial court sentenced the defendant to 50 years' imprisonment for first degree murder and a concurrent term of 15 years' imprisonment for home invasion. The defendant filed the instant appeal asserting that: (1) the trial court erred in denying his motion to quash his arrest and suppress his statement; (2) he was denied his right to a trial before a fair and impartial jury because the trial court failed to *sua sponte* dismiss one of the jurors for cause; (3) the State improperly introduced hearsay testimony implicating him in the commission of the crimes charged; (4) the State elicited prejudical and inflammatory testimony about the decedent and his family for the sole purpose of appealing to the jury's sympathy and to create a sense of outrage; (5) his first degree murder conviction was the product of a double enhancement and constitutes double jeopardy; (6) his 50-year sentence for first degree murder is excessive; and (7) the mittimus should be amended to reflect the proper credit for time served prior to sentencing.[2]

The defendant and three codefendants, Anthony Porter, Martin Johnson, and Theodore Glaspie, were charged with first degree murder and home invasion in connection with the shooting of Kenyatta Wilkins, which took place on October 15, 1997. Prior to trial, the defendant filed a single motion seeking to quash his arrest, alleging that it was made without probable cause, and to suppress evidence, including his inculpatory statement. The defendant also filed a separate motion seeking to suppress his inculpatory statement on the basis that he was not advised of his rights before making it.

---

[1]Pursuant to a supervisory order issued by the Illinois Supreme Court on May 30, 2002 (*People v. Ollie*, 199 Ill. 2d 572, 772 N.E.2d 742 (2002)), this court vacated its initial decision in the instant case, entered on February 7, 2002 (*People v. Ollie*, No. 1—00—1311 (2002) (unpublished order under Supreme Court Rule 23)). The following opinion represents our resolution of all issues on appeal.

[2]In order to comply with the appellate court opinion page limitations as mandated by our supreme court, the discussion of issues two, three, and four has been designated as nonpublishable material. A full, unabridged text of this decision is on file with the clerk of this court under docket number 1—00—1311.

The trial court first conducted a hearing at which it heard the defendant's motion to quash his arrest simultaneously with similar motions filed by Porter and Johnson. The evidence as it pertained to the defendant is as follows. The defendant called Chicago police officer Patrick Keating to testify. According to Keating, when he began his shift on October 15, 1997, he learned that Chicago police detectives Lenihan and Ryan wished to speak with a person known as "Red" in connection with a murder investigation they were conducting. Having previously had contact with a man named Willie Lewis, also known as "Red", Keating checked police files to find Lewis's address, which was listed 7244 South Artesian Avenue. Around 11 or 11:30 p.m. on October 15, 1997, Keating and Chicago police officers Glynn, Clisham, and Jesionowski went to that address. The officers did not have an arrest warrant for Lewis or a search warrant for the premises. When the officers rang the doorbell, Lewis's mother answered the door. According to Keating, he identified himself as a police officer and stated that he wished to speak to Lewis in connection with an investigation. Keating testified that Lewis's mother allowed him into the house and told him that Lewis was upstairs. Keating and Glynn then went upstairs.

Carolyn Farrar, Lewis's mother, offered a far different version of events. According to Farrar, when she answered her door, she told the officers that Lewis was not there. Farrar testified that she agreed to speak to the officers but stated that she wanted to get a housecoat before letting them in the house. When she walked away from the door, though, the officers "just stormed into" the house, following her to the back of the house and then going into the basement and upstairs. Farrar testified that, after retrieving her housecoat, she went into the basement, where she found that four police officers had Lewis's three friends, including the defendant, handcuffed and kneeling on the floor. Farrar estimated that there were 15 to 20 police officers at her house. Some of the officers had helmets, shields, and battering rams.

The State called Officer Jesionowski to testify. Jesionowski confirmed Keating's testimony that Farrar allowed the officers into the house. He testified that none of the officers had helmets, shields, or a battering ram. According to Jesionowski, while Keating and Glynn were upstairs, he heard some people moving around in the basement. He and Officer Clisham went downstairs to investigate. The officers found the defendant, Porter, and Johnson in the basement and asked the men "if they knew what was going on over on Damen." According to Jesionowski, the men immediately stated that Lewis was not involved in the shooting. Jesionowski asked the three men whether they would be willing to accompany the officers to the police station to

speak with detectives, and the men agreed. Jesionowski testified that the officers did not put the men in handcuffs at any time or place them on their knees. He further testified that, upon discovering the three men in the basement, the officers called for another unit to assist them, but there were never more than six officers present at the Lewis home. Jesionowski testified that he did pat down the three men to make sure that they were not armed. According to Jesionowski, Keating and Glynn transported Lewis to the police station, while he and Clisham transported the defendant, Porter, and Johnson. When they arrived at the police station, Jesionowski and Clisham placed the defendant, Porter, and Johnson in an interview room together and closed the door, turning the case over to detectives. Jesionowski did not know if the door to the room was locked.

Detective Robert Lenihan testified that he and his partner, Detective Bernard Ryan, were assigned to investigate Wilkins' murder. The detectives had received information that a person known as Red and his friends had exchanged gunfire with the victim and his friends the day prior to the murder. When he began his shift at 8:30 a.m. on October 16, 1997, he learned that Lewis, the defendant, Porter, and Johnson were at the station waiting to be interviewed. Lenihan testified that the defendant, Porter, and Johnson were not handcuffed, that they were all in the same room, and that the room was not locked. Lenihan introduced himself to the men and stated that he wished to speak with them but that there were other things he needed to do first. He asked the men to be patient. According to Lenihan, the men asked ''how long it would take'' and, when he said he would be as quick as possible, they did not object.

Lenihan testified that he and his partner returned to the station around 3 or 3:30 p.m. and brought the men food. Lenihan then spoke to Porter, the defendant, Lewis, and Johnson, individually, in that order. It was between 3 and 5 p.m. when he spoke to the defendant. Lenihan advised the defendant of his *Miranda* rights before speaking to him. The defendant stated that he did not know anything about the murder. After speaking to the defendant, Lenihan returned him to the room with Porter and Johnson. When asked why he read the defendant his rights prior to interviewing him, Lenihan responded that the defendant was involved in the incident the day prior to the victim's murder and that he did not know what the defendant was going to say about either that incident or the murder. Upon further questioning, though, Lenihan acknowledged that, at the time he first interviewed the defendant, he had no information that the defendant was involved in the incident the day prior to the murder.

According to Lenihan, when he spoke to Johnson, Johnson stated

that, on October 14, 1997, he and his friends were involved in two altercations with the victim and his friends. After this conversation with Johnson, Lenihan and Ryan went to Johnson's residence, where they left their card with Johnson's father, along with a request that Johnson's mother contact them. Lenihan testified that the detectives wished to speak with Johnson's mother because they had been told that she had information relevant to their investigation. Upon leaving the Johnson home, the detectives returned to the police station. According to Lenihan, he then confronted Johnson with some unspecified information, and Johnson gave an oral statement naming himself, Lewis, Porter, the defendant, and two other people as participants in the victim's murder. Lenihan testified that, before Johnson gave the statement, he had checked Johnson's background and discovered that there was an outstanding juvenile warrant for Johnson's arrest. According to the detective, Johnson was "in custody at that time when we found out that he had a juvenile warrant."

Lenihan testified that, based upon Johnson's statement, the defendant and Porter were separated and "put in locked rooms, they were taken into custody."

The defendant's girlfriend, Jammie Miller, testified in rebuttal. Miller was upstairs in bed with Lewis when the police arrived. She testified there were "a lot" of officers in the house and that the officers were "rambling" through the house, searching it. When Miller later went down to the first floor, she saw the officers take the defendant, Porter, and Johnson out of the house in handcuffs. She did not see any officers with helmets, shields, or a battering ram.

In surrebuttal, Officer Glynn testified that the defendant, Porter, and Johnson were not handcuffed, that the officers never searched the house, and that there were never more than six officers on the scene.

In ruling on the defendant's motion, the trial court specifically found that Farrar's testimony about the officers' conduct was not credible and that it was "more reasonable" that the events occurred as stated by the officers. He found that the defendant was not handcuffed and voluntarily accompanied the officers to the police station. The court also found that the facts that the defendant was placed in a room with Johnson and Porter, rather than by himself, and that the officers did not prepare an arrest report supported a finding that the defendant was not under arrest when he arrived at the police station. The trial court found that there was no evidence that the defendant asked to leave from the time that he arrived at the station to the time that Detective Lenihan arrived and spoke briefly to him, asking him to wait and be patient. The court stated that: "At some point their status changed and that is unclear at this point from my

reading of it in terms of the statements they made. \*\*\* I'm dealing only with the initial taking into custody and going to the station up until Lenihan deals with them. They went voluntarily and remained voluntarily for a period of time." The trial court denied the motion to quash arrest, finding that the defendant was voluntarily at the station at least until the time that Detective Lenihan spoke to him at 8:30 a.m. on October 16. The court, however, made no finding as to when the defendant was placed under arrest.

On a subsequent date, the trial court conducted a hearing at which it simultaneously heard the motions to suppress statements filed by the defendant and Porter. Detective Ryan was the only witness to testify at the hearing. Ryan testified that, around 3 p.m. on October 16, 1997, he and Detective Lenihan interviewed Porter for 10 to 20 minutes. Thereafter, the detectives interviewed the defendant. Lenihan advised the defendant of his rights pursuant to *Miranda*. The defendant stated that he understood each of the rights and that he wished to speak with the detectives. Ryan testified that the detectives then had a 10- to 20-minute conversation with the defendant during which they asked him general questions. The defendant did not implicate himself in the victim's murder during that conversation. At the end of the conversation, the defendant was returned to the room with Porter and Johnson. Asked if he ever told the defendant that he was free to leave, Ryan answered that he "never used those express words" but that the defendant was told several times during the day that he was there to assist Lewis and that he was not under arrest. Ryan testified that the police usually keep cooperative witnesses together, but do not keep suspects together.

Ryan testified that he and Lenihan had a second conversation with the defendant around 7 p.m. on October 16. Lenihan again advised the defendant of his *Miranda* rights, and the defendant again stated that he understood them. According to Ryan, this conversation lasted 15 to 25 minutes. After this conversation, Ryan testified, he had no further contact with the defendant in connection with the murder investigation. Prior to this second interview with the defendant, Johnson had already given a statement implicating the defendant in Wilkins' murder.

According to Ryan, he advises a "fair amount" of the witnesses that he interviews of their *Miranda* rights because some people who come in as witnesses later turn out to be co-offenders. In the defendant's case, he was a "close associate" of Lewis, who was a suspect. Ryan testified that he believed that the room where the defendant, Porter, and Johnson were being kept was locked. He testified that even witnesses are not allowed to walk around the police sta-

tion unaccompanied, that the men were told to knock on the door if they needed anything, that they were told they were witnesses and were not under arrest, and that they would have been allowed to leave if they had asked to do so.

The parties stipulated that, at 12:50 a.m. on October 18, the defendant gave a handwritten statement regarding the shooting of the victim to Assistant State's Attorney Steve Klaczynski and Chicago police detective Nowakowski.

In ruling on the defendant's motion to suppress his statement, the trial court repeated its earlier finding that the defendant was not under arrest when he was transported to the station. The court again found the officers' testimony to be credible and noted the officers' testimony that the defendant was free to leave the station and would have been allowed to do so had he asked. The court stated that "there's a difference between being free to leave a police station and [being] free to roam the police station." The court further found that, based on the evidence presented at the hearing, it was "obvious" that the defendant was in custody "by 7:00 on the 17th," after Johnson made his statement implicating the defendant. The trial court denied the defendant's motion to suppress his statement.

The trials of the defendant and his three codefendants were severed. The court conducted simultaneous but separate jury trials for the defendant and Porter. At the defendant's trial, the State introduced evidence that the victim's body was found in a second-floor apartment located at 2039 West 53rd Street on the morning of October 15, 1997, and that the victim died as a result of multiple gunshot wounds. The only evidence that the State introduced connecting the defendant with the victim's murder was the defendant's own statement. Assistant State's Attorney Klaczynski testified that he first interviewed the defendant around 11:45 p.m. on October 17, 1997, at which time the defendant made an oral statement. At 12:50 a.m. on October 18, 1997, Klaczynski took a handwritten statement from the defendant, memorializing the earlier oral statement. He advised the defendant of his *Miranda* rights prior to each statement. Klaczynski read the handwritten statement into evidence. According to the defendant's statement, on the morning of October 15, 1997, the defendant and five other men devised a plan to kill "Yatti" (the victim). The plan provided that the defendant and two others were to act as "lookouts" while the remaining three men went inside and killed the victim. The defendant stated that the six men went in two cars to 2039 West 53rd Street. The defendant and two other men stayed outside while the remaining three men went inside. Shortly thereafter, the defendant heard several shots and then saw the three men run out of the building and get into

one of the cars. All of the men then drove away. The defendant drove one of the two cars.

The defendant rested without calling any witnesses. The jury was instructed regarding the offenses of home invasion, intentional murder, knowing murder, and felony murder. It was also instructed regarding the theory of accountability. Following deliberation, the jury returned a guilty verdict as to the offense of home invasion and a general verdict of guilty as to the offense of first degree murder. At sentencing, the trial court stated that it was most appropriate to enter judgment on the felony murder count and ordered that the counts alleging knowing and intentional murder would merge with the felony murder count. The trial court then sentenced the defendant to concurrent prison terms of 50 years for first degree murder and 15 years for home invasion. The defendant has appealed.

■ On appeal, the defendant first argues that the trial court erred in denying his motion to quash his arrest and suppress his inculpatory statement. Here, the defendant filed a motion seeking to quash his arrest, alleging that it was made without probable cause, and to suppress any evidence, including his inculpatory statement. He also filed a separate motion to suppress his statement on the basis that he was not advised of his rights prior to giving the statement. On appeal, the defendant contends only that the trial court erred in failing to suppress the statement as the product of an illegal arrest. While we review determinations of probable cause *de novo*, we will not disturb the trial court's findings of fact unless they are against the manifest weight of the evidence. *Ornelas v. United States*, 517 U.S. 690, 698-99, 134 L. Ed. 2d 911, 919-20, 116 S. Ct. 1657, 1662-63 (1996); *People v. Sorenson*, 196 Ill. 2d 425, 431, 752 N.E.2d 1078 (2001); *People v. Centeno*, 333 Ill. App. 3d 604, 615-16 (2002). We will also give due weight to the inferences the trial court has drawn from those facts. *Ornelas*, 517 U.S. at 698-99, 134 L. Ed. 2d at 919-20, 116 S. Ct. at 1662-63; *Sorenson*, 196 Ill. 2d at 431.

■ Probable cause exists where, at the time of the arrest, the facts and circumstances known to the police officer would lead a reasonable person to believe that the defendant had committed a crime. *People v. Williams*, 275 Ill. App. 3d 249, 253, 655 N.E.2d 1071 (1995). An arrest effectuated without either a warrant or probable cause violates an individual's constitutional right to be free from unlawful searches and seizures. *People v. Melock*, 149 Ill. 2d 423, 436, 599 N.E.2d 941 (1992); U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6.

The defendant contends that he was under arrest when he was taken from the Lewis home and that, even if he was not under arrest at that moment, he was, in any event, under arrest long before he

made an incriminating statement. The State acknowledges that the officers did not have probable cause to arrest the defendant at the time he was transported to the station. It asserts, however, that the trial court properly found that the defendant was not arrested until 7 p.m. on October 16, when he was formally placed under arrest. At that time, the State contends, the officers did have probable cause to arrest the defendant as Johnson had given a statement naming him as a participant in the victim's murder.

■ A person has been arrested when his freedom of movement is restrained by physical force or a show of authority. *Melock*, 149 Ill. 2d at 436. In determining whether an arrest has occurred, the key inquiry is whether, under the circumstances, a reasonable innocent person would have concluded that he was not free to leave. *People v. Reynolds*, 94 Ill. 2d 160, 164, 445 N.E.2d 766 (1983). In determining whether an arrest has occurred, a court may consider the number of police officers present, whether the officers displayed a weapon or touched the person, whether the officers used language suggesting that the person was compelled to obey, and whether any of the practices that normally accompany an arrest, such as searching, handcuffing, and fingerprinting, took place. *People v. Bolden*, 197 Ill. 2d 166, 180, 756 N.E.2d 812 (2001).

■ We first address the defendant's assertion that he was under arrest at the time the officers transported him to the station. The testimony of Officers Keating, Glynn, and Jesionowski established that: four officers went to the address on Artesian Avenue looking for Lewis because detectives wished to speak with him; while the officers were there, they encountered the defendant; the defendant stated that Lewis was not involved in the shooting, and, upon being asked to accompany the officers to the station to discuss the matter, the defendant agreed; and the defendant was not handcuffed. The trial court specifically found the officers' accounts of the events to be credible and rejected Farrar's testimony that the police officers entered her home with helmets, shields, and battering rams. The defendant does not challenge the trial court's credibility determinations or factual findings. He contends, however, that, even based upon the facts as testified to by the officers, he was under arrest when he was transported to the station. In support of this contention, the defendant points to the facts that additional officers were called to the scene after the officers discovered him, Porter, and Johnson in the basement, that he was not given the option of going to the police station on his own, and that officers patted him down before transporting him. It is true that the number of officers present is a factor to be considered when determining whether an arrest occurred. See *People v. Brown*, 136 Ill. 2d 116,

124-25, 554 N.E.2d 216 (1990). However, Officers Glynn and Jesion-owski testified that there were never more than six officers on the scene, and there is no evidence that the additional officers called to the scene had any interaction whatsoever with the defendant. Further, the officers' testimony, which the trial court found to be credible, established that no force was used and that the defendant was not handcuffed. We also cannot say that the fact that the officers patted down the defendant before he got into their car or that they did not ask the defendant if he wished to provide his own transportation to the station compels a finding that the defendant was under arrest. Rather, considering the totality of the circumstances, and giving the requisite deference to the trial court's credibility and factual findings, we conclude that the defendant was not under arrest when he first accompanied the officers to the station.

■ Our inquiry does not end there, though. Voluntary presence at the police station in order to assist with an investigation may progress into unlawful detention with the passage of time. *People v. Booker*, 209 Ill. App. 3d 384, 393, 568 N.E.2d 211 (1991). Illinois courts have repeatedly rejected the proposition that a person who voluntarily accompanies the police to the station for questioning "implicitly consents to remain in the police station while the police investigate the crime to obtain probable cause for the interviewee's arrest." *People v. Barlow*, 273 Ill. App. 3d 943, 950, 654 N.E.2d 223 (1995). See *People v. Wallace*, 299 Ill. App. 3d 9, 701 N.E.2d 87 (1998) (defendant remained in an interview room with door closed until he made incriminating statement; defendant was not free to move about station, not told he could leave, and was advised of *Miranda* rights several times); *Barlow*, 273 Ill. App. 3d 943 (defendant left in locked interview room for six hours while police conducted investigation); *People v. Booker*, 209 Ill. App. 3d 384, 568 N.E.2d 211 (1991) (defendant left in processing room with access to telephone while police conducted interview, at various intervals was questioned and asked to submit to physical examination and polygraph test); *People v. Sturdivant*, 99 Ill. App. 3d 370, 425 N.E.2d 1046 (1981) (rejecting State's argument that the defendant freely chose to remain in police station for nine hours). In the instant case, approximately 19 hours elapsed between the defendant's arrival at the police station and his formal arrest. We must consider the events which occurred during that 19-hour period in order to determine whether the defendant's presence at the station remained voluntary.

■ Upon arriving at the police station shortly after midnight on October 16, 1997, the defendant was placed in an interview room together with Porter and Johnson. There was conflicting testimony as to whether the interview room was locked. Jesionowski did not know

if the door to the room was locked and Lenihan believed that it was not. Ryan, on the other hand, believed the room was locked. The trial court made no finding of fact on the issue. At any rate, it is clear that the door to the room was closed and that the men could not leave the room unaccompanied. The defendant contends that the fact that he was placed in an interview room with the door closed and possibly locked rather than in a public waiting area indicates that he was under arrest. See *People v. Reynolds*, 257 Ill. App. 3d 792, 801, 629 N.E.2d 559 (1994); *People v. Young*, 206 Ill. App. 3d 789, 799, 564 N.E.2d 1254 (1990). The State disagrees. It points to Ryan's testimony that the reason the door was locked was that no one, including a witness, is allowed to walk around the police station unaccompanied. The detective testified that the men were told to knock on the door if they needed anything. Ryan also testified that, while the defendant was never expressly told that he could leave, he was told that he was not under arrest. The State further asserts that the fact that the defendant was placed in the interview room together with Johnson and Porter indicates he was not under arrest. We agree with the trial court that this fact suggests the defendant was being treated as a witness rather than a suspect. See *People v. Walls*, 220 Ill. App. 3d 564, 578, 581 N.E.2d 264 (1991) (court found it significant that defendant was accompanied to station for questioning by his friend and that defendant was aware there were others present at station for questioning as well). In our opinion, a reasonable innocent person, having voluntarily accompanied the officers to the station and having been placed in a room with two friends and informed that he was not under arrest and should knock on the door if he needed anything, would have believed he was free to go, even if the door was locked.

At the time the defendant and the others were brought to the station for questioning, Lenihan and Ryan, the detectives in charge of the investigation, were not on duty. Accordingly, the men sat in the interview room without being interviewed from shortly after midnight on October 16 to about 8:30 a.m. that same day, when the detectives arrived. The defendant was not interviewed at that point. Rather, Lenihan briefly spoke to the defendant, introducing himself, stating that he had other matters to attend to in connection with the investigation, and asking the defendant to be patient. The defendant asked how long Lenihan's other matters would take, and the detective stated that he did not know but would try to return as quickly as possible. According to Lenihan, the defendant did not object. We note, however, that the defendant was not given the option of leaving the station and returning at a later time. See *Young*, 206 Ill. App. 3d at 801-02 (finding that State failed to provide adequate explanation of

why defendant was not given option of going home and returning at later time when officer would be available to interview him). When Lenihan and Ryan returned to the station around 3 or 3:30 p.m., they finally began interviewing the men. The detectives interviewed Porter first and then the defendant, advising the defendant of his *Miranda* rights. The detectives testified that they advised the defendant of his rights just "to be safe" as they did not know what the defendant would say. There is no evidence, however, that the defendant was told he was being advised of his rights merely as a precautionary matter. While not in itself dispositive of the question of whether an arrest has occurred, the giving of *Miranda* warnings is commonly recognized as an indicia of arrest. *Barlow*, 273 Ill. App. 3d at 949. Further, we find it very significant that, after interviewing the defendant, the detectives did not tell the defendant that he was free to go even though, having questioned the defendant, "the police had ostensibly accomplished their articulated purpose for bringing defendant to the police station" (*Young*, 206 Ill. App. 3d at 800-01). Rather, the detectives returned the defendant to the interview room with Porter and Johnson. We find that, at that time, a reasonable innocent person, having been advised of his *Miranda* rights, having stated that he knew nothing about the crime in question, and having been returned to the interview room rather than released, would not have believed that he was free to go. See *Centeno*, 333 Ill. App. 3d at 616; *Young*, 206 Ill. App. 3d at 800-01. Accordingly, we conclude that the defendant was under arrest no later than the time at which he was placed back into the interview room following his first interview, which, according to the testimony of Detectives Lenihan and Ryan, was at approximately 4 p.m. on October 16. The State does not even assert that the officers had probable cause to arrest the defendant anytime prior to his formal arrest at 7 p.m. on October 16.

■ Our finding that the defendant was subject to an illegal arrest does not, however, answer the question of whether the handwritten statement that Klaczynski took from the defendant at 12:50 a.m. on October 18 was admissible at his trial. *Wallace*, 299 Ill. App. 3d at 18. A confession obtained following an illegal arrest may, nonetheless, be admissible if the confession was sufficiently an act of the defendant's free will such that it is purged of the primary taint of the illegal arrest. *People v. White*, 117 Ill. 2d 194, 222, 512 N.E.2d 677 (1987). In *Brown v. Illinois*, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62 (1975), the United States Supreme Court set forth four factors to be considered in determining whether a confession obtained following an illegal arrest was a product of that arrest or was purged of the initial taint. These factors are: (1) the temporal proximity

between the arrest and the confession; (2) the presence of intervening circumstances; (3) the purpose and flagrancy of the police misconduct; and (4) whether *Miranda* warnings were given. *Brown*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62. The State bears the burden of demonstrating, by clear and convincing evidence, sufficient attenuation of evidence obtained through an illegal arrest. *People v. Foskey*, 136 Ill. 2d 66, 86, 554 N.E.2d 192 (1990); *People v. Wright*, 294 Ill. App. 3d 606, 612, 691 N.E.2d 94 (1998).

In the instant case, the trial court, having concluded that the defendant was not the subject of an illegal arrest, never considered the question of attenuation. The defendant contends that there are not sufficient attenuating circumstances to purge his inculpatory statement of the taint of his illegal arrest and that, accordingly, we should reverse his conviction, suppress his statement, and remand for a new trial. The State asserts that, if we find that the defendant was illegally arrested, we should remand the matter to the trial court in order for it to conduct an attenuation hearing. In order to determine the appropriate course of action, we must consider whether the record before us is sufficiently complete to allow an independent determination on the issue of attenuation.

The first factor at issue is the temporal proximity of the defendant's illegal arrest to his confession. As we have concluded, the defendant was under arrest no later than 4 p.m. on October 16, 1997, when the detectives, upon completing their first interview with the defendant, did not tell the defendant he was free to go but returned him to the interview room with Porter and Johnson. Klaczynski took a handwritten statement from the defendant at 12:50 a.m. on October 18, 1997. Therefore, the defendant was in custody for approximately 33 hours at the time he gave the inculpatory statement at issue. Courts have noted that a significant lapse of time between an illegal arrest and the making of a statement is an ambiguous factor that "may serve to amplify the coercion latent in a custodial setting, particularly when there are other indicia of coercion" or, on the contrary, "may help to purge the taint of a prior illegality by allowing an accused to reflect on his situation, particularly when attended by other factors ameliorating coercion, such as *Miranda* warnings." *People v. Lekas*, 155 Ill. App. 3d 391, 414, 508 N.E.2d 221 (1987); see also *White*, 117 Ill. 2d at 223-24. There was no evidence introduced as to what occurred between 7 p.m. on October 16, when the defendant was formally placed under arrest, and 11:45 p.m. on October 17, when Klaczynski first interviewed the defendant. Accordingly, we are unable to determine whether the 33-hour lapse of time here weighs in favor of or against a finding of attenuation.

Another factor to consider in determining whether a statement given subsequently to an illegal arrest is admissible is whether the defendant was advised of his rights prior to being questioned. Although it is not enough, standing alone, to purge the taint of a defendant's illegal arrest, the giving of *Miranda* warnings clearly weighs in favor of a finding of attenuation. *People v. Jennings,* 296 Ill. App. 3d 761, 764, 695 N.E.2d 1303 (1998). From the record, we know that the defendant was advised of his *Miranda* rights when he was interviewed by Lenihan, Ryan, and Klaczynski. Again, however, the record is silent as to what happened between 7 p.m. on October 16 and 11:45 p.m. on October 17. Accordingly, we are unable to determine whether the defendant was interviewed without the benefit of *Miranda* warnings during that time period.

The flagrancy of police misconduct, or lack thereof, and the presence or absence of intervening circumstances have emerged as the key factors in determining whether a statement obtained subsequent to an illegal arrest is sufficiently purged of the taint of that arrest to be admissible. *Jennings,* 296 Ill. App. 3d at 765. From the record before us we are able to determine that the officers did not go out in search of the defendant and, in fact, had no reason to believe the defendant was involved in the victim's murder at the time they asked him to accompany them to the station. Although the defendant was placed in an interview room with the door closed, and possibly locked, he was kept with his friends until such time as he had been named as a participant in the victim's murder. We do not believe these circumstances evidence flagrant and purposeful police misconduct. As with the previous two factors, though, without knowing what occurred at the police station between the hours of 7 p.m. on October 16 and 11:45 p.m. on October 17, we are not able to state definitively whether this factor weighs in favor of or against a finding of attenuation.

The final factor to be considered is whether there were any intervening circumstances that served to purge the defendant's confession of the taint of his illegal arrest. See *People v. Turner,* 259 Ill. App. 3d 979, 993, 631 N.E.2d 1236 (1994). The confrontation of a defendant with new legally obtained information is one possible intervening circumstance that may produce a voluntary desire to confess and, thereby, render the statement admissible. *Jennings,* 296 Ill. App. 3d at 766. At trial, Lenihan testified that, during the 7 p.m. interview on October 16, the defendant was "confronted with certain facts." He did not, however, testify as to the nature of these facts or the manner in which the detectives learned of them. It is possible that the detectives confronted the defendant with the fact that Johnson made a statement naming him as a participant in the murder. We cannot say. The

defendant contends that, even if he was informed of Johnson's statement, this cannot serve as an intervening circumstance sufficient to attenuate his statement from the illegal arrest because Johnson himself was illegally under arrest at the time he made his statement. In support of this proposition, the defendant relies on *People v. Austin*, 293 Ill. App. 3d 784, 688 N.E.2d 740 (1997), and *People v. Beamon*, 255 Ill. App. 3d 63, 627 N.E.2d 316 (1993), in each of which case the court held that the confrontation of an illegally arrested defendant with a statement made by a codefendant also under illegal arrest cannot serve as an intervening circumstance constituting attenuation. We note that there is some question as to whether the holdings in *Austin* and *Beamon* conflict with the holding of our supreme court in *People v. James*, 118 Ill. 2d 214, 226, 514 N.E.2d 998 (1987), that a defendant lacks standing to seek suppression of his confession on the ground that it is the product of someone else's illegal arrest. See *Austin*, 293 Ill. App. 3d at 791-93 (Quinn, J., specially concurring); *People v. Ornelas*, 295 Ill. App. 3d 1037, 1045 n.1, 693 N.E.2d 1247 (1998). We need not decide the conflict at this time, however. Not only is the record before us insufficient to allow a determination as to whether the defendant was ever confronted with Johnson's statement, it is also insufficient to allow a determination as to whether Johnson was illegally under arrest at the time he gave that statement. Further, as we have noted, the record is silent as to what took place between the time of the defendant's formal arrest at 7 p.m. on October 16, 1997, and 11:45 p.m. on October 17, when Klaczynski first interviewed the defendant. It is clear that we do not have enough information to enable us to determine whether intervening circumstances exist sufficient to purge the defendant's statement of the taint of his illegal arrest.

■ As the record before this court is not sufficient to allow us to make an independent determination on the matter of attenuation, we find that the appropriate course of action is to vacate the defendant's convictions and sentences and remand this cause to the trial court with directions to conduct a hearing to determine whether the defendant's inculpatory statement was sufficiently attenuated from his illegal arrest to render it admissible. See *Wallace*, 299 Ill. App. 3d at 9.

Since the trial court may find that sufficient attenuating circumstances exist to render the defendant's inculpatory statement admissible, we will discuss the defendant's remaining contentions of error, none of which were raised in the defendant's motion for a new trial. As a general rule, a defendant's failure to include an issue as the basis for relief in his posttrial motion results in a waiver of the issue for

purposes of appeal. See *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988). The defendant asserts that we should, nonetheless, review the issues under the doctrine of plain error or under the theory that his trial counsel provided ineffective assistance in failing to preserve the issues for our review. Waiver aside, we will address the defendant's contentions.

The defendant argues that his first degree murder conviction should be vacated because it is the product of impermissible double enhancement. Alternatively, the defendant argues that his convictions for both home invasion and felony murder violated the double jeopardy clause of the fifth amendment. As stated above, the defendant in this case was indicted for home invasion and three types of first degree murder; namely, intentional murder, knowing murder, and felony murder, as provided in subsections (a)(1) through (a)(3) of section 9—1 of the Criminal Code of 1961 (Code) (720 ILCS 5/9—1(a)(1) through (a)(3) (West 1996)). The jury was instructed as to each of these offenses and as to the law regarding accountability. The jury rendered a verdict of guilty for home invasion and first degree murder without designating the type of first degree murder upon which it based its finding of guilt. At sentencing, the trial court found that it was most appropriate to enter judgment on the felony murder count and ordered that the knowing and intentional murder counts be merged into the felony murder count. Each of the defendant's arguments is premised upon the fact that he was convicted of felony murder, rather than intentional or knowing murder. We agree with the State, however, that the trial court erred in entering judgment on the felony murder count rather than the intentional murder count. We will explain.

■ It is well settled that, where an indictment contains several counts arising out of a single transaction and the jury returns a general verdict, the defendant is guilty as charged in each count to which the proof is applicable. *People v. Kidd*, 178 Ill. 2d 92, 126, 687 N.E.2d 945 (1997). Further, where multiple convictions are obtained for offenses arising out of a single act, sentence is imposed on the most serious offense. *People v. Cardona*, 158 Ill. 2d 403, 411, 634 N.E.2d 720 (1994). As between the offenses of intentional, knowing, and felony murder, intentional murder is deemed to be the most serious. *Cardona*, 158 Ill. 2d at 412.

We find our supreme court's decision in *People v. Cardona*, 158 Ill. 2d 403, 634 N.E.2d 720 (1994), to be instructive here. In *Cardona*, the defendant was charged with intentional, knowing, and felony murder and the jury returned a general verdict. The trial court entered judgment on all three counts of murder but ordered that the judgments

for intentional and knowing murder were merged into the judgment for felony murder and imposed sentence for felony murder. Our supreme court, concluding that the evidence was sufficient to support a verdict of guilty for intentional murder upon the theory of accountability, held that the trial court erred in imposing sentence on felony murder. *Cardona*, 158 Ill. 2d at 411-13. The court affirmed the defendant's conviction for intentional murder and vacated his convictions for knowing and felony murder. *Cardona*, 158 Ill. 2d at 414.

■ We now consider whether the evidence in the instant case was sufficient to sustain a conviction for intentional murder based upon the theory of accountability. A person is legally accountable for the conduct of another when, before or during the commission of an offense and with the intent to promote or facilitate the commission of said offense, he solicits, aids, or agrees or attempts to aid the other person in the planning or commission of the offense. 720 ILCS 5/5—2 (West 1996). The evidence adduced at trial reveals that, on the morning of October 15, 1997, the defendant and five other men traveled in two cars to the victim's home to carry out a prearranged plan to kill the victim. The defendant drove one of the cars. When the group arrived at the victim's address, the defendant sat in his car and acted as a lookout while three other men kicked in the door. Thereafter, the defendant heard gunshots and saw the three men run from the building. All six men then fled the scene. The evidence is sufficient to establish that the defendant was legally responsible for the intentional murder of the victim.

The defendant cites *Griffin v. United States*, 502 U.S. 46, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991), and *Stromberg v. California*, 283 U.S. 359, 75 L. Ed. 2d 1117, 51 S. Ct. 532 (1931), for the proposition that where, as here, a defendant is charged with multiple counts arising out of the same act and a general verdict is returned, a conviction cannot be upheld if a conviction on any one of the theories of guilt is legally impermissible. Arguing that he could not legally be convicted of felony murder both because it constitutes an impermissible double enhancement and because it violates principles of double jeopardy, the defendant contends that no murder conviction can stand under any theory, including that of intentional murder. As there is no validity to the defendant's assertion that he could not be convicted of felony murder, we disagree.

■ "[D]ouble enhancement occurs when a factor previously used to enhance an offense or penalty is again used to subject a defendant to a further enhanced offense or penalty." *People v. Koppa*, 184 Ill. 2d 159, 174, 703 N.E.2d 91 (1998). The defendant appears to argue that the act of murder enhanced the misdemeanor offense of criminal

trespass to residence to the felony of home invasion and then also provided the basis for the felony murder conviction. In support of his argument, the defendant cites *People v. Johnson*, 154 Ill. 2d 356, 609 N.E.2d 294 (1993), for the proposition that "where a home invasion cannot be supported without relying on the acts which caused the victim's death, a conviction of both murder and home invasion constitutes an illegal double enhancement." The defendant misstates the holding in *Johnson*. In *Johnson*, as here, the defendant was convicted of both home invasion and felony murder, based on the predicate felony of home invasion. The court, noting that the home invasion charge was based on the defendant's conduct of entering the victim's home and stabbing him, found that home invasion was necessarily a lesser included offense of murder and vacated the home invasion charge. *Johnson*, 154 Ill. 2d at 371-72. We fail to see how *Johnson* offers any support for the defendant's contention that his murder conviction should be vacated as a result of double enhancement. In fact, we find no support at all for the defendant's contention in this regard.

The defendant also contends that his murder conviction should be vacated because his conviction for both that offense and home invasion violates double jeopardy principles. The fifth amendment states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The test for determining whether a person has been punished more than once for the same offense in violation of the double jeopardy clause is found in *Blockburger v. United States*, 284 U.S. 299, 304, 76 L. Ed. 306, 309, 52 S. Ct. 180, 182 (1932), in which the Court held: "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not."

In support of his contention that his murder conviction violates the prohibition against double jeopardy, the defendant relies upon *People v. Gilyard*, 251 Ill. App. 3d 117, 621 N.E.2d 625 (1993). In *Gilyard*, as here, the defendant was convicted of home invasion and felony murder, based on the underlying felony of home invasion. Relying on *Johnson*, cited above, the court concluded that, under the circumstances, home invasion constituted a lesser included offense of felony murder and vacated the defendant's conviction for home invasion. Again, we fail to see how this supports the defendant's assertion that his murder conviction cannot stand. At most, *Johnson* and *Gilyard* stand for the proposition that the defendant here cannot be convicted of both felony murder and home invasion but offer no support for the proposition that the defendant cannot be convicted of felony murder.

We have already determined that the evidence at trial was sufficient to sustain a conviction for intentional murder under the theory of accountability. As such, under the principles set forth in *Cardona*, we find that the trial court erred in entering judgment on the felony murder count rather than the intentional murder count. The defendant's contentions that his first degree murder conviction cannot stand, all of which are based on the premise that he was convicted of felony murder rather than intentional murder, lack merit.

■ For reasons that will become obvious, before turning to the defendant's contention that his 50-year sentence for first degree murder is excessive, we will first address the State's assertion that the trial court erred in ordering the defendant's sentences to run concurrently rather than consecutively. In *People v. Arna*, 168 Ill. 2d 107, 113, 658 N.E.2d 445 (1995), our supreme court held that, when consecutive sentences are mandatory, a sentencing order imposing concurrent prison terms is void and that a reviewing court has the authority to correct the void sentencing order at any time despite the fact that the State does not have the right to appeal sentencing orders. Accordingly, we will consider whether the trial court was required to impose consecutive sentences as the State argues.

At the time the offenses in the instant case were committed, section 5—8—4 of the Unified Code of Corrections required that the trial court impose consecutive sentences where "one of the offenses for which the defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5—8—4(a), (b) (West 1996 & Supp. 1997). This was so whether or not the offenses were committed as part of a single course of conduct during which there was no change in the nature of the criminal objective. 730 ILCS 5/5—8—4(a), (b) (West 1996 & Supp. 1997). Our supreme court has mandated that, in order to render the mandatory consecutive sentencing provision at issue applicable, the severe bodily injury must have been inflicted during the commission of the triggering Class X or Class 1 felony. *People v. Whitney*, 188 Ill. 2d 91, 98-99, 720 N.E.2d 225 (1999).

Although murder is not itself a triggering offense under the applicable version of section 5—8—4(a) of the Code[3] (*Whitney*, 188 Ill. 2d at 100), the victim's death may nonetheless serve as the requisite

---

[3]Pursuant to an amendment which became effective January 1, 2000, section 5—8—4 of the Code now includes first degree murder as a triggering offense under subsections (a) and (b). 730 ILCS 5/5—8—4(a), (b) (West 2000). Citing the current version of section 5—8—4, the State argues that consecutive sentences are mandated by virtue of the defendant's first degree murder conviction. To impose consecutive sentences on the defendant pursuant to this

severe bodily injury where it was inflicted during the commission of the triggering Class X or Class 1 felony. *People v. Thompson*, 331 Ill. App. 3d 948 (2002); *People v. Sample*, 326 Ill. App. 3d 914, 761 N.E.2d 1199 (2001); *People v. Carney*, 327 Ill. App. 3d 998, 1001-02, 765 N.E.2d 1028 (2002).

The defendant in the instant case was convicted of first degree murder and home invasion, which is a Class X felony (720 ILCS 5/12—11(c) (West 1996)). He argues that the severe bodily injury to the victim arose not out of the home invasion, which would be a triggering offense under sections 5—8—4(a) and (b), but out of the first degree murder, which is not a triggering offense. We disagree.

In *People v. Sample*, 326 Ill. App. 3d 914, 761 N.E.2d 1199 (2001), the defendant was convicted of first degree murder, armed robbery, and home invasion. In rejecting the defendant's assertion that the imposition of consecutive sentences was improper because the severe bodily injury to the victim arose out of the first degree murder, a non-triggering offense, rather than the armed robbery or home invasion, both triggering offenses, the court stated:

> "Defendant admitted that at the outset and throughout the crime, his intent was to rob the victim of drugs. Within the course of a few minutes, defendant, and those for whose actions he was held criminally responsible, entered [the victim]'s home by force, threatened him with a weapon, shot him, and stole his drugs. To parse out the crimes into bounded acts would contradict the reality that these crimes were intertwined both temporally and functionally." *Sample*, 326 Ill. App. 3d at 928.

See also *People v. Thompson*, 331 Ill. App. 3d 948 (2002) (holding that consecutive sentences were proper where victim killed during commission of an armed robbery); *Carney*, 327 Ill. App. 3d at 1001-02 (same).

█ In the instant case, the defendant and five other men went to the victim's address to carry out a prearranged plan to kill him. When the men arrived, the defendant and two others stayed outside to act as lookouts while the remaining three men forced their way into the victim's apartment and killed him. The use of force is an element of the type of home invasion with which the defendant was charged. 720 ILCS 5/12—11(a)(1) (West 1996). We conclude that the death of the victim in this case occurred during the commission of the home invasion, a Class X felony.

Citing *People v. Miller*, 193 Ill. App. 3d 918, 930-32, 552 N.E.2d

postoffense amendment, though, would constitute a violation of the constitutional prohibition against *ex post facto* laws. *People v. McCleary*, 278 Ill. App. 3d 498, 500, 663 N.E.2d 22 (1996).

988 (1989) and *People v. Phelps*, 329 Ill. App. 3d 1, 768 N.E.2d 168 (2002), *allowed*, 201 Ill. 2d 602 (2002), the defendant contends that to impose a consecutive sentence based on the infliction of severe bodily injury, which is inherent in the offense of first degree murder, would constitute an impermissible double enhancement. The courts in *Miller* and *Phelps* held that consecutive sentences could not be ordered under section 5—8—4 based on the infliction of severe bodily injury where severe bodily injury was inherent in the triggering offense. *Miller*, 193 Ill. App. 3d at 930-32; *Phelps*, 329 Ill. App. 3d at 7-11. We first note that the divisions of the First District of this court are divided as to whether the holding in *Miller* remains good law following our supreme court's decisions in *Whitney*, *People v. Wagener*, 196 Ill. 2d 269, 752 N.E.2d 430 (2001), and *People v. Carney*, 196 Ill. 2d 518, 752 N.E.2d 1137 (2001). See *Sample*, 326 Ill. App. 3d at 930-31 (First District, Second Division); *Thompson*, 331 Ill. App. 3d 948 (First District, Third Division); *Carney*, 327 Ill. App. 3d at 1003 (First District, Fourth Division) (all concluding that double enhancement concerns are not implicated); *Phelps*, 329 Ill. App. 3d at 7-11 (First District, First Division) (holding that double enhancement concerns are implicated under some circumstances). We need not, however, settle this dispute as the instant case is factually distinguishable from both *Miller* and *Phelps*. As stated, in both *Miller* and *Phelps*, severe bodily injury was inherent in the triggering offense. The court in *Phelps* explicitly stated that no similar prohibition would exist where the triggering offense did not have severe bodily injury as an element, specifically identifying home invasion as such an offense. *Phelps*, 329 Ill. App. 3d at 11; see also *Thompson*, 331 Ill. App. 3d 948; *Sample*, 326 Ill. App. 3d at 931; *Carney*, 327 Ill. App. 3d at 1003-04. The defendant here was convicted of home invasion, a Class X felony which does not have severe bodily injury as an element. See 720 ILCS 5/12—11(a)(1) (West 1996). Accordingly, we find no merit to the defendant's argument that consecutive sentences cannot be imposed.

Because the defendant was convicted of a Class X felony during the commission of which severe bodily injury was inflicted, we conclude that the trial court erred in ordering the defendant's sentences for first degree murder and home invasion to run concurrently rather than consecutively.

■ As a final matter, we note that the defendant contends, and the State concedes, that he is entitled to two more days of credit for time served than the trial court awarded him.

For the foregoing reasons, we vacate the defendant's convictions and sentences for first degree murder and home invasion and remand the cause to the circuit court with directions that it conduct an at-

tenuation hearing. If the circuit court finds that the defendant's confession is sufficiently attenuated from his illegal arrest to render it admissible, the court is directed to enter a judgment of conviction for the offense of first degree murder pursuant to section 9—1(a)(1) of the Code (intentional murder) (720 ILCS 5/9—1(a)(1) (West 1996)) and a conviction for home invasion pursuant to section 12—11(a)(1) of the Code (720 ILCS 5/12—11(a)(1) (West 1996)), to conduct a new sentencing hearing to determine the appropriate sentences to be imposed consecutively (see *People v. Arna*, 263 Ill. App. 3d 578, 589, 635 N.E.2d 815 (1994), *aff'd*, 168 Ill. 2d 107 (1995)), and to award the defendant the appropriate amount of credit for time served. If, on the other hand, the trial court finds that no such attenuation exists to purge the defendant's confession from the taint of his illegal arrest, we direct it to suppress the confession and conduct further proceedings not inconsistent with this opinion. In doing so, we note that we have reviewed all of the evidence presented at trial, including the defendant's confession, and find that it was sufficient to support the defendant's convictions for first degree murder and home invasion beyond a reasonable doubt such that a retrial would not be barred due to the constitutional prohibition against double jeopardy. *People v. Olivera*, 164 Ill. 2d 382, 393, 647 N.E.2d 926 (1995). Our disposition has rendered it unnecessary that we address the defendant's contention that his sentence for first degree murder is excessive.

Judgment vacated and cause remanded with directions.

HARTMAN and THEIS, JJ., concur.