2021 IL App (1st) 190588-U

No. 1-19-0588

Order filed July 29, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 7151 |
| | ) | |
| JONATHAN PRIMM, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Reyes and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction and sentence for intentional first degree murder over his contentions that the trial court violated Illinois Supreme Court Rule 431(b) and imposed an excessive sentence. We vacate defendant's sentence for felony murder as it violates the one-act, one-crime rule, and order his mittimus corrected to reflect one conviction and sentence for first degree murder.

¶ 2    Following a jury trial, defendant Jonathan Primm was found guilty of three counts of first

degree murder (720 ILCS 5/9-1(a)(1), (a)(3) (West 2010)). The trial court merged one of the counts

and sentenced defendant to two concurrent terms of 40 years' imprisonment on the remaining

counts. On appeal, defendant contends (1) the trial court failed to properly admonish the jury pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); (2) his multiple convictions for murder violate the one-act, one-crime doctrine; and (3) the trial court abused its discretion in imposing his sentence by failing to consider mitigating evidence and relying on an improper aggravating factor. For the following reasons, we affirm in part and vacate in part.

¶ 3    The State proceeded to trial on three counts of first degree murder of the victim, Darius Chambers.[1] Count I charged defendant with intentional murder by beating, kicking, and killing Chambers with his hands and feet (720 ILCS 5/9-1(a)(1) (West 2010)). Count II charged defendant with beating, kicking, and killing Chambers with his hands and feet, knowing that such acts created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2010)). Count III charged defendant with killing Chambers during the course of a forcible felony (robbery) (720 ILCS 5/9-1(a)(3) (West 2010)). Since defendant does not contest the sufficiency of the evidence, we recite only those facts necessary to our disposition.

¶ 4    At the beginning of *voir dire*, the court informed the venire that defendant was presumed innocent of the charges against him and would continue to be presumed innocent throughout the course of proceedings. It continued:

"It is absolutely essential as we select this jury that each of you understand and embrace these fundamental principles; that is, that all persons charged with the crime are

---

[1] Donnte Kindle, Jabril Garner, and Antoine Ward were separately charged in the beating death of Chambers. Kindle and Garner were found guilty of first degree murder in separate but simultaneous jury trials and sentenced to 28 years' and 35 years' imprisonment, respectively. Ward pled guilty to first degree murder and was sentenced to 21 years' imprisonment.

presumed to be innocent and that it is the burden of the State who has brought the charges to prove the defendant guilty beyond a reasonable doubt.

What this means is that the defendant has no obligation to testify on his own behalf or to call any witnesses in his defense. He may simply sit here and rely upon what he and his lawyers perceive to be the inability of the State to present sufficient evidence to meet their burden. Should that happen, you will have to decide the case on the basis of the evidence presented by the prosecution.

The fact that the defendant does not testify must not be considered by you in any way in arriving at your verdict. However, should the defendant elect to testify or should his lawyers present witnesses in his behalf, you are to consider that evidence in the same manner and by the same standards as the evidence presented by the State's attorneys. The bottom line, however, is that there's no burden upon the defendant to prove his innocence. It's the State's burden to prove him guilty beyond a reasonable doubt."

¶ 5    As *voir dire* continued, the court asked the prospective jurors, individually and in groups, the following two questions: "The State has the burden of proof beyond a reasonable doubt. Do you agree with and accept that proposition of law?" and "The defense has no burden. He's presumed innocent. He doesn't have to testify or call witnesses. If he doesn't testify, you can't hold that against him. Do you agree and accept those propositions of law?" The jurors all responded affirmatively to each question.

¶ 6    At trial, Stephen Willis testified he was with Chambers on October 30, 2011. The two men walked to a bus stop at 79th Street and Greenwood Avenue to wait for a bus around 1:30 or 2 a.m. While at the bus stop, a man approached them. Two additional men also approached, followed by

a fourth man. Two of the men stood beside Chambers, one stood by Willis, and another paced behind them. Willis felt something was wrong, and when one of the men asked to use his phone, he declined. Someone hit Willis from behind and he ran toward a friend's house nearby to call 911. One of the men chased after him. Willis did not observe what happened to Chambers. A police officer subsequently brought Willis back to the scene, where he observed Chambers on the ground covered by a sheet. On the night of the attack, Chambers had a cellphone and was wearing glasses.

¶ 7    Willis identified Jabril Garner as the man who asked to use his cellphone and Antoine Ward as the first man who approached the bus stop. Willis was unable to identify defendant in a lineup following the incident.

¶ 8    The parties stipulated that if called, Marquitta Jones would testify she was driving on 79th Street approaching the Greenwood intersection around 3 a.m. on October 30, 2011. Jones observed a black man running across 79th Street and proceeding through the gate for a building on Greenwood. She did not see the person's face and would not be able to identify him. Jones also observed a person lying on the sidewalk by the bus stop. She called police and spoke with them upon their arrival.

¶ 9    Jamira Primm testified that in October 2011 she lived in a third-floor apartment on the corner of 79th and Greenwood (the Greenwood apartment) with her parents Shannon and Jeffrey and her siblings. Defendant was her cousin. On the night in question, Jamira fell asleep on the couch with her brother Jalen.[2] She woke up at some point and looked out the window with Jalen. She observed three "boys" at the bus stop across the street. She did not know their names. One

---

[2] Many of the trial witnesses have the same last name as defendant: Primm. The trial testimony referenced other Primm family members. Except for defendant, we will refer to each Primm family member by his or her first name once introduced.

man was in a Hollister sweatshirt and another was wearing a red hoodie. They were all fighting, and the man in the red hoodie was kicking someone she did not know who was on the ground. Following the fight, Jamira saw Donnte Kindle, Garner, and defendant come into the Greenwood apartment. She identified defendant in court.

¶ 10    When asked what defendant was wearing that night, Jamira alternately stated she did not know and that he "put on a red hoodie." She later clarified she meant he put on the hoodie when he returned to the house. Jamira acknowledged that when defendant was inside the house after the man was kicked at the bus stop, defendant was wearing a red hoodie. She later stated she observed the face of the person wearing the red hoodie and identified him as defendant.

¶ 11    When asked "who else was out there other than [defendant]," Jamira testified Ward, Kindle, and Garner. She later testified defendant "was out there," and when asked if she observed him kicking and stomping anyone, she responded, "Everybody was out there. Everybody was out there doing something."

¶ 12    Jamira acknowledged that she appeared before the grand jury on November 15, 2011, but denied testifying that defendant was kicking a man on the ground at the bus stop. She also denied testifying that she knew it was defendant kicking the man because he had his hood on and was wearing a bright red jacket, which he had on when he returned to the apartment.

¶ 13    A court reporter identified a transcript from a November 15, 2011, grand jury hearing. Before the grand jury, Jamira testified she looked out the window and observed defendant "kicking and beating the man" and he also kicked the man in the head while he was on the ground.

¶ 14    Jalen Primm, who was seven years old in 2011, testified defendant was his cousin. Jalen lived in the Greenwood apartment during the relevant time period with his parents, Shannon and

Jeffrey, his siblings, and defendant. On the night of the incident, Garner, Kindle, Ward, and defendant were at the Greenwood apartment before Jalen went to sleep.

¶ 15    Jalen woke up and looked out of the kitchen window around 3 a.m. He observed four "boys" beating up a man. Jalen identified the four boys as Garner, Ward, Kindle, and defendant. He knew the men because they were friends with his brother, Arnold Mitchell. Jalen observed defendant, Garner, Kindle, and Ward punching and kicking the man. He also observed the man's friend running with Garner and Kindle chasing him. Following the beating, the four men returned to the Greenwood apartment. Shannon and Jeffrey woke up at some point, and Jeffrey called the police, who took defendant and Kindle away.

¶ 16    Jalen identified defendant in a photo array on the day following the beating, and in court. He identified Ward in a photo array on October 31, 2011, and a lineup on November 2, 2011. On October 31, 2011, he identified Garner and Kindle in separate lineups. Jalen specified Mitchell was in his room during the beating and was not outside with the other men. Garner, Kindle, and Ward were friends with Mitchell, not defendant.

¶ 17    Shannon Primm testified defendant lived at the Greenwood apartment with her family. She identified him in court. She went to bed around 10:30 p.m. on the night in question. Her daughter, Tatanisha, woke up her up around 3 a.m. and told her to look out the window, which faced the bus stop. When she looked out the window, there were police outside and a man lying in the street covered by a white sheet near the bus stop. Shannon went into the living room, which was dark. It was unusual to have the lights off in their apartment.

¶ 18    When Jeffrey, her husband, turned on the lights to call the police, Ward and Garner ran out the back door. Defendant and Kindle sat on the couch. Defendant was wearing a red hoodie.

Shannon did not know what had happened at that point. When they police arrived, they "took" defendant and Kindle. The following morning, Shannon found an identification card of someone she did not know in her kitchen, which a detective later collected.

¶ 19    Arnold Mitchell testified that on October 29, 2011, he arrived home at the Greenwood apartment with Ward after attempting to attend a party. Defendant, Garner, and Kindle were there. Defendant, whom he identified in court, was his stepfather's nephew. Mitchell had known Ward and Garner since they were in seventh grade. Kindle was related to Garner, but Mitchell did not know him well. At the Greenwood apartment, Mitchell heard defendant talking about a "187" and a "stain," both of which Mitchell understood meant a robbery. Defendant was "basically trying to get whoever wanted to go out with him and do what he was going to do." Mitchell did not want to participate and instead went to his room to go to sleep sometime between 12 a.m. and 2 a.m. Ward, defendant, Kindle, and Garner were still in the living room.

¶ 20    At some point, Mitchell woke up and noticed that the lights were off. Jamira and Jalen were looking out the living room window. Mitchell looked outside with them and observed a body on the sidewalk on 79th Street. The police were not outside. Mitchell then observed defendant and Kindle come through the back door of the Greenwood apartment. Mitchell returned to his room and heard Ward ask, "How much you got?" He did not hear defendant say anything, but he heard someone respond, "Not a lot."

¶ 21    Mitchell acknowledged he gave a handwritten statement to Assistant State's Attorney Kelly Gretskas on November 1, 2011. In his statement, he said defendant had answered "not a lot" when Ward asked how much money he took. Mitchell further acknowledged testifying before the grand jury that defendant responded to Ward, " 'not enough, not much or something like that.' "

¶ 22    A court reporter identified a transcript from a November 14, 2011, grand jury hearing, where Mitchell testified he went to a party with Ward and "Jabril (?)." She put a question mark after "Jabril" because she was not sure what Mitchell had said.

¶ 23    Janilah Primm testified she was alone in her room at the Greenwood apartment around 2 a.m. on October 30, 2011, and was 12 years old at that time. She heard defendant say he "had a stain," and Garner responded, "come on, we gone." Janilah then heard footsteps leaving and the door close. At some point after that, Janilah heard multiple people come into the Greenwood apartment, who started turning off the lights. She went into the living room and observed defendant, Ward, Kindle, and Garner. Janilah asked the men what was going on, and defendant calmly told her to go lie down. Instead of returning to her room, Janilah looked out the window and observed someone who was not moving on the ground by the bus stop across the street. Mitchell also came to look out the window. She did not observe where Mitchell came from, but he was wearing "house wear."

¶ 24    Janilah called her brother Jabari and her sister Tatanisha, both of whom arrived home shortly thereafter. Tatanisha spoke with Shannon, who then came out of her bedroom. Janilah identified defendant in court.

¶ 25    Officer Charles McClay testified he responded to the scene and, based on a conversation with Marquitta Jones, he went with his partner to the Greenwood apartment. McClay had descriptions of two offenders, one of whom was wearing a Hollister sweatshirt and another who was a black male in his late teens. Inside the residence, McClay detained defendant and Kindle, who matched the descriptions. Kindle was wearing a Hollister sweatshirt.

¶ 26    Chicago police officer Juan Aguirre testified he processed the crime scene. He collected a knit cap, a receipt, an unused condom, and a pair of broken glasses on the ground around Chambers. Aguirre identified photographs he took of Chambers and noted his pants pockets "seemed to be partially turned out with some of the contents exposed."

¶ 27    Retired detective Earl Parks testified that he investigated Chambers' homicide. At the scene, he interviewed Willis and Jones. Parks spoke with some of the Primm family at the Greenwood apartment a few hours after the incident, but "they basically were kind of like a little afraid," so he gave them time and spoke with them later that day at the police station. He learned defendant and Kindle had been detained and met them at the police station. Willis was unable to identify defendant and Kindle in a lineup, but he identified Garner and Ward. Willis stated he did not observe two of the offenders who had been behind him. Parks released defendant on October 30, 2011, but he was arrested again later.

¶ 28    On October 31, 2011, Parks spoke again with Jalen and Shannon. Jalen mentioned defendant was involved at that point. Jalen identified Kindle, Garner, and Ward in physical lineups and defendant and Ward in photo arrays. Parks later learned Chambers' identification was recovered in the Greenwood apartment, and his cellphone was recovered from a vacant lot next to the Greenwood apartment.

¶ 29    Parks also interviewed Mitchell, who at one point stated that defendant said to turn off the lights when he reentered the Greenwood apartment. No one, including the Primm family or Willis, identified Mitchell as a possible offender. Parks acknowledged he did not write in the police report that Willis reported one of the offenders wearing a red hoodie. A different report showed that

Willis reported one offender was wearing a Hollister sweatshirt. The police collected Kindle's Hollister sweatshirt as evidence but did not collect a red hoodie.

¶ 30    Dr. Joshua Akers, an expert in forensic pathology, testified he reviewed the autopsy report for Chambers. The autopsy revealed significant skeletal injuries, a hemorrhage in his temporalis muscle, abrasions to his forehead and cheek, and a patterned injury consistent with a shoe print. The cause of death for Chambers was the result of a subarachnoid hemorrhage due to blunt force injuries to his head from an assault and the manner of death was homicide.

¶ 31    Detective Majdi Shalabi testified he was a police officer on March 18, 2013, working with a task force to capture fugitives. On that date, he went to a residence on South Martin Luther King Drive looking for someone other than defendant. Inside the residence, he arrested defendant hiding in an alcove. Upon finding defendant in the alcove, Shalabi asked defendant for his name. Defendant did not initially respond, but later identified himself as "Michael" with a last name that Shalabi could not recall. Eventually, defendant gave his name as "Jonathan Primm" and Shalabi learned there was a warrant out for his arrest for first degree murder. Shalabi was in plain clothes but identified himself as a police officer and was wearing a vest with his star and a gun belt.

¶ 32    The jury found defendant guilty of first degree murder.

¶ 33    Defendant filed a motion for new trial, arguing in relevant part, that the court failed to properly admonish the jury regarding the principles enumerated in Illinois Supreme Court Rule 431 (eff. July 1, 2012) by stating defendant was not required to present witnesses, rather than evidence, on his behalf. The court denied the motion.

¶ 34    At sentencing, the State submitted a victim impact statement from Rosa Hardy, Chambers' mother. The State argued defendant's role in the events that led up to the murder should be

considered in aggravation. Specifically, it noted defendant was heard talking about a robbery and "concocted the plan to go up and rob" the victims after observing them at the bus stop from the Greenwood apartment.

¶ 35    Defendant's presentence investigation report (PSI) showed he had a high school diploma and was involved in the Black Disciples gang. He had a prior 2009 conviction for unlawful possession of a handgun and was sentenced to 18 months' probation, which was terminated unsatisfactorily. Defendant was not employed prior to being incarcerated but did side jobs for money. His PSI further reflected that he did not "feel that he committed a crime" in the instant case.

¶ 36    In mitigation, defendant submitted letters of support from his friends and family and certificates of completion of study. Defense counsel argued defendant was currently 27 years old, had an insignificant criminal record, and had been employed. Counsel argued the significant support from friends and family showed defendant was capable of being rehabilitated and had previously volunteered in his community.

¶ 37    The court noted it read Hardy's victim impact statement, reviewed the letters and documentation submitted in mitigation, and reviewed the statutory factors in aggravation and mitigation. The court recited the statutory factors in mitigation, finding many did not apply to defendant. It then stated that defendant was one of the "ringleaders in this scenario" and was "pretty much the main inducer or character that triggered the offense." Defendant and the co-offenders "beat the first victim to death and picked his body over and took the proceeds off of him," which were ultimately recovered from the Greenwood apartment where defendant had lived. The court noted defendant had a prior unlawful weapon conviction and received probation, but

that was terminated unsatisfactorily which indicated to the court that defendant "may actually go out there and commit another violent [offense]."

¶ 38    The court found:

"I think the circumstances if given the chance to rob again and stalk the site of a bus location where potential victims would come up to wait for the bus, I think that's a situation where the defendant could revert to that type of criminal conduct and down the road commit another robbery."

The court also found defendant was a threat to the community. In reciting the factors in aggravation, the court stated defendant "could have taken the money and ran away instead of beating the guy to death, four men on one." It found defendant received compensation, which was "the whole purpose of this robber/murder." The court merged count II (strong probability murder) into count I (intentional murder) and ultimately sentenced defendant to 40 years' imprisonment on both counts I and III (felony murder), "specifically factoring in the idea that when he comes out of the penitentiary, he will still be able to have some time left in his life to convert into productive fashion."

¶ 39    On appeal, defendant first argues that the trial court failed to properly admonish the jury pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 40    Defendant concedes that he failed to object to the trial court's failure to comply with Rule 431(b). See *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010) ("To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion."). Nevertheless, he argues that we should review the error under the first prong of the plain error doctrine. See *People v. Sebby*, 2017 IL 119445, ¶¶ 51-52 (Rule 431(b) violations are reviewed

under the first prong of the plain error doctrine). The plain error doctrine permits a reviewing court to consider unpreserved errors when " '(1) the evidence in a criminal case is closely balanced or (2) where the error is so fundamental and of such magnitude that the accused was denied a right to a fair trial.' " *People v. Harvey*, 211 Ill. 2d 368, 387 (2004) (quoting *People v. Byron*, 164 Ill. 2d 279, 293 (1995)). It is the defendant's burden to establish plain error. *Thompson*, 238 Ill. 2d at 613. Our first step is to determine whether a clear and obvious error occurred. *Thompson*, 238 Ill. 2d at 613.

¶ 41    Supreme Court Rule 431(b) provides that, during *voir dire* examination of prospective jurors, a trial court shall ask each potential juror, individually or in a group, whether the juror understands and accepts that: (1) the defendant is presumed innocent of the charges against him; (2) the State must prove the defendant guilty beyond a reasonable doubt before the defendant can be convicted; (3) the defendant is not required to offer any evidence on his own behalf; and (4) if a defendant does not testify, it cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The method of inquiry must provide each juror with an opportunity to respond to specific questions concerning the enumerated principles. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Each of these specific questions "goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury." *People v. Zehr*, 103 Ill. 2d 472, 476 (1984). Although the rule mandates a specific question and response process, where the trial court must ask each juror whether he or she understands and accepts each of the principles in the rule, it is not required to use the specific language of the rule in instructing the prospective jurors. *People v. Kidd*, 2014 IL App (1st) 112854, ¶ 36.

¶ 42    To comply with the rule, the court must (1) instruct the prospective jurors on the four principles, (2) ask if the prospective jurors understand those principles, and (3) ask if the prospective jurors accept those principles. *People v. Birge*, 2021 IL 125644, ¶ 34. There is no requirement that the trial court recite the four principles separately or explain the principles to the jurors in any particular fashion. *Birge*, 2021 IL 125644, ¶ 34. Whether the trial court violated Rule 431(b) involves construction of the rule, controlled by the same principles applicable to the construction of statutes, and is reviewed *de novo*. *Thompson*, 238 Ill. 2d at 606.

¶ 43    Defendant alleges the trial court erred in (1) failing to ascertain whether the prospective jurors "understood" the enumerated principles, (2) stating defendant did not have to present "witnesses" rather than "evidence," and (3) comingling three of the principles into one proposition of law, rather than addressing them separately.

¶ 44    A review of the record reveals the trial court erred by failing to ask the jurors whether they understood the four principles set forth in Rule 431(b). Although at the outset the court told the prospective jurors that they needed to "understand and embrace" the *Zehr* principles, during the portion of *voir dire* where the jurors were able to answer the court's questions, the court asked whether they agreed with and accepted the *Zehr* principles. See *People v. Wilmington*, 2013 IL 112938, ¶ 32 (a "trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself" (emphasis in original)). The court did substantially comply with Rule 431(b) regarding the other contentions of error raised by defendant. See *Birge*, 2021 IL 125644, ¶ 34 (the supreme court has never held "that the trial court must recite the principles *separately* to the prospective jurors, and the plain language of the rule *** does not require the court to explain the principles to the jurors in any particular fashion" (emphasis in original)); see also *People v.*

*Anderson*, 2021 IL App (1st) 182558-U, ¶ 32 (cited as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)) (finding the court did not violate Rule 431(b) when it "asked potential jurors if they understood that 'an accused is not responsible for proving anything in a criminal case?' and if they accepted that an accused does not have to testify, call witnesses, or prove anything in a criminal case").[3]

¶ 45    That said, we find the error did not rise to the level of plain error because the evidence against defendant was not closely balanced. See *Sebby*, 2017 IL 119445, ¶ 68 (to prove plain error, a defendant must show the evidence was closely balanced, or in other words, the error "occurred in a close case where its impact on the result was potentially dispositive"). A case is closely balanced when "it can hardly be said that reasonable jurors could only draw from [the evidence] a conclusion of guilt." *People v. Nelson*, 193 Ill. 2d 216, 223 (2000). When the evidence is closely balanced, a Rule 431(b) error is "potentially dispositive" and therefore prejudicial. *Sebby*, 2017 IL 119445, ¶ 68. To determine whether a case was closely balanced, we undertake "a qualitative, commonsense assessment" of the evidence as a whole, including any evidence that bears on the credibility of the witnesses. *Sebby*, 2017 IL 119445, ¶ 53.

¶ 46    To prove defendant guilty as charged, the State had to prove defendant killed Chambers without lawful justification, and in performing the acts which caused Chambers' death, either intended to kill or do great bodily harm to Chambers, or knew that such acts would cause his death. 720 ILCS 5/9-1(a)(1) (West 2010). Here, the evidence overwhelmingly showed defendant

_____

[3] In his reply brief, defendant acknowledges that, under our supreme court's *Birge* decision, collapsing three principles into one is not plain error. However, he seeks to preserve the issue should the supreme court reach an opposite conclusion on rehearing in *Birge*.

participated in the beating death of Chambers by first discussing committing a robbery and then kicking and beating Chambers to death with others during the course of a robbery.

¶ 47    Defendant's cousins Janilah and Mitchell testified they heard defendant speak about a "stain," which meant robbery. Mitchell testified defendant was "basically trying to get whoever wanted to go out with him and do what he was going to do." Janilah then heard footsteps and the apartment door close, and later heard multiple people enter the Greenwood apartment and turn off the lights. Defendant was present in the hallway when she exited her room. Defendant was heard saying he did not get "enough" when asked by his co-offender how much he "got" after the robbery and beating. Chambers was found with his pockets turned out, his phone was found in the vacant lot next to the Greenwood building, and his identification was found in the Greenwood apartment.

¶ 48    Additionally, two of defendant's other cousins, Jalen and Jamira, who witnessed the beating, identified defendant as one of the offenders beating and kicking Chambers. Although at trial Jamira did not identify defendant at trial as one of the attackers, the State impeached her with her grand jury testimony identifying him as one of the men kicking and beating Chambers. Moreover, Jamira's testimony at trial that a man in a red hoodie was involved in the beating pointed to defendant being one of the offenders, as this testimony was corroborated by Shannon's testimony that defendant was wearing a red hoodie that night. Additionally, when defendant was arrested, there was a warrant out for his arrest and he was found hiding in an alcove in a residence that police had entered. Flight is "generally considered some evidence of a guilty mind," and when considered with all the other evidence, "is a circumstance that a factfinder may consider as tending to prove guilt." *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 64.

¶ 49    Although defendant argues there were inconsistencies in Mitchell's and Janilah's testimony regarding the lights in the apartment and whether the men were inside at the time Janilah looked out the window, we cannot say this rendered the evidence closely balanced. Nor are we persuaded by defendant's argument that Willis was unable to identify him in a lineup. Detective Parks testified that Willis explained he did not observe two of the men who had been behind him during the attack and, as previously described, defendant was identified by two cousins, who knew him, as being one of the offenders. In sum, we find the evidence presented was not so closely balanced that the court's error in *voir dire* alone may have tipped the scales in favor of the State and, therefore, any error by the trial court in that regard does not rise to the level of plain error. See *Sebby*, 2017 IL 119445, ¶ 78.

¶ 50    Next, defendant argues his multiple murder convictions violate the one-act, one-crime doctrine, as they were premised on the same physical act: the killing of Chambers. He requests that we amend the mittimus to "remove the conviction and sentence" on count III (felony murder). Although defendant did not request that his convictions be merged, the State concedes that his conviction for felony murder should have been merged into his conviction for intentional murder, the more serious offense, and defendant's mittimus should be corrected to reflect one count of murder for the single victim he killed. We agree.

¶ 51    The one-act, one-crime doctrine prohibits multiple convictions arising from the same physical act. *People v. Miller*, 238 Ill. 2d 161, 165 (2010). An "act" is defined as "any overt or outward manifestation which will support a different offense." *People v. Almond*, 2015 IL 113817, ¶ 47. If an indictment charges the defendant for a single course of conduct, even if multiple theories of culpability are presented, the trial court cannot convict the defendant for separate criminal

acts. *People v. Crespo*, 203 Ill. 2d 335, 345 (2001). Where guilty verdicts are obtained for multiple counts arising from the same act, a sentence should be imposed on the most serious offense. See *People v. Donaldson*, 91 Ill. 2d 164, 170 (1982). Whether a violation of the one-act, one-crime rule has occurred is a question of law that is reviewed *de novo. People v. Smith*, 2019 IL 123901, ¶ 15.

¶ 52    In this case, defendant was found guilty of three counts of first degree murder, counts I, II, and III, under different theories of culpability. The court merged count II into count I and sentenced defendant to 40 years' imprisonment on count I and 40 years on count III, to be served concurrently. As the court did not sentence defendant on count II, this count is not before us. *People v. Flores*, 128 Ill. 2d 66, 95 (1989) ("[I]t is axiomatic that there is no final judgment in a criminal case until the imposition of sentence, and, in the absence of a final judgment, an appeal cannot be entertained.").

¶ 53    Count I charged defendant with intentional murder by beating, kicking, and killing Chambers with his hands and feet (720 ILCS 5/9-1(a)(1) (West 2010)). Count III charged defendant with murder for beating, kicking, and killing Chambers with his hands and feet during the commission of a forcible felony (720 ILCS 5/9-1(a)(3) (West 2010)).

¶ 54    Although felony murder involves an additional physical act beyond the acts that cause the death, felony murder is not a separate offense from intentional murder but, rather, a separate theory of the same offense: first degree murder. *People v. Coats*, 2018 IL 121926, ¶¶ 22-23 (citing 720 ILCS 5/9-1(a) (West 2016)). A defendant therefore cannot be convicted of both the intentional murder and felony murder of the same victim. *Coats*, 2018 IL 121926, ¶ 23. Where only one person has been murdered, there can be only one conviction of murder; and where multiple

convictions are obtained for offenses arising out of a single act, sentence is imposed on the most serious offense. *People v. Cardona*, 158 Ill. 2d 403, 411 (1994).

¶ 55 Because both of defendant's first degree murder convictions were premised on defendant's killing the same victim, Chambers, only the more serious murder conviction may be sustained. See *Cardona*, 158 Ill. 2d at 411. Intentional murder involves a more culpable mental state than felony murder. *Cardona*, 158 Ill. 2d at 412 ("Where charges of intentional *** and felony murder have been proved, intentional murder is deemed to be the most serious offense."). Therefore, defendant's sentence should be imposed only on count I. Accordingly, we vacate defendant's sentence for felony murder under count III and order that defendant's mittimus reflect a single conviction for first degree murder on count I. See *People v. Artis*, 232 Ill. 2d 156, 170 (2009) ("This court has 'always held' that under the one-act, one-crime doctrine, sentence should be imposed on the more serious offense and the less serious offense should be vacated.").

¶ 56 Finally, defendant poses several challenges to his sentence. He first argues the trial court improperly relied on a factor inherent in the offense of felony murder when it considered that defendant obtained proceeds from the crime in imposing sentence. Defendant states his felony murder conviction was predicated on robbery, and taking proceeds is an element of robbery. See 720 ILCS 5/18-1(a) (West 2010) ("A person commits robbery when he or she knowingly takes property *** from the person or presence of another by the use of force."). However, because we vacate defendant's sentence for felony murder, we need not address this claim.

¶ 57 Defendant lastly argues his 40-year sentence is excessive in light of the mitigating evidence he presented.

¶ 58 The Illinois Constitution provides that "[a]ll penalties shall be determined both according

to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. We accord great deference to a trial court's sentence and will not reverse it absent an abuse of discretion. *People v. Butler*, 2013 IL App (1st) 120923, ¶ 30 (citing *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000)). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Jackson,* 375 Ill. App. 3d 796, 800 (2007). In determining an appropriate sentence, the trial court considers such factors as "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment." *People v. Hernandez*, 319 Ill. App. 3d 520, 529 (2001). Because the trial court, having observed the proceedings, is in the best position to weigh the relevant sentencing factors (*People v. Arze*, 2016 IL App (1st) 131959, ¶ 121), we do not substitute our judgment for that of the trial court simply because we would have balanced the appropriate sentencing factors differently (*People v. Alexander*, 239 Ill. 2d 205, 213 (2010)).

¶ 59     Defendant was sentenced to 40 years' imprisonment for first degree murder, which falls within the statutory sentencing range of 20 to 60 years. See 730 ILCS 5/5-4.5-20(a) (West 2018) (sentencing range for first degree murder)). Thus, we presume his sentence was proper, absent some indication otherwise. See *People v. Burton,* 2015 IL App (1st) 131600, ¶ 36.

¶ 60     Defendant contends that the trial court failed to consider the evidence presented in mitigation. Defendant argues that the court did not accord enough weight to the support from his family, who attended the sentencing hearing and submitted 17 letters in support describing him as smart, respectful, and a role model. Defendant also claims the court failed to consider he was 20

years old at the time of the offense, he had a high school diploma, the circumstances of the offense were unlikely to reoccur, and he was active in his community.

¶ 61    Defendant essentially asks this court to reweigh the evidence presented in aggravation and mitigation and substitute our judgment for that of the trial court. We decline to usurp a function uniquely reserved for the trial court. See *Stacey*, 193 Ill. 2d at 209. Further, absent some affirmative indication to the contrary, other than the sentence itself, we presume the trial court considered all mitigating evidence before it. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. Defendant does not make that contrary showing here.

¶ 62    In fact, the record belies defendant's contentions that the court did not properly consider the mitigating evidence. In imposing sentence, the court explicitly considered the statutory factors in aggravation and mitigation, reciting many of the factors and finding them inapplicable to defendant. See 730 ILCS 5/5-5-3.1 (West 2018) (factors in mitigation); 730 ILCS 5/5-5-3.2 (West 2018) (factors in aggravation). The court also stated it considered the victim impact statement and evidence submitted in mitigation. It stated it reviewed the "letters and documents in support of mitigation in this case." It also explicitly considered defendant's rehabilitative potential, stating defendant's probation in his prior case was terminated unsatisfactorily and its belief that he would commit another robbery if given the opportunity. It further found defendant to be a threat to the community, yet sentenced him to 40 years with the intent that, when he was released from the penitentiary, he would have time left to live a productive life.

¶ 63    Although defendant believes the letters of support from his family should outweigh the other evidence, the trial court is not required to assign them the weight he urges. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123 ("Because the most important sentencing factor is the

seriousness of the offense, the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, nor does the presence of mitigating factors either require a minimum sentence or preclude a maximum sentence.").

¶ 64    Defendant's sentence is not manifestly disproportionate to the nature of the offense. The trial court, in imposing sentence, noted defendant was the ringleader. This is supported by the evidence, which established defendant initiated the robbery by telling the other men he had a "stain." Further, defendant participated in brutally beating Chambers to death as he waited at a bus stop. Chambers' autopsy revealed he died from a hemorrhage in his brain and had a patterned injury on his head consistent with a shoe print, among other abrasions on his face. These particularly graphic circumstances show defendant's sentence was not disproportionate to the nature of the offense. See *Harmon*, 2015 IL App (1st) 122345, ¶ 123 (the seriousness of offense is the most important sentencing factor). In sum, the trial court did not abuse its discretion in sentencing defendant to 40 years in prison for first degree murder.

¶ 65    For the foregoing reasons, we vacate defendant's sentence for first degree murder on count III, order defendant's mittimus corrected to reflect one count of first degree murder on count I, and affirm the trial court's judgment in all other respects.

¶ 66    Affirmed in part; vacated in part; mittimus corrected.