2025 IL App (1st) 240136-U

SIXTH DIVISION

May 9, 2025

No. 1-24-0136

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Respondent-Appellee, | ) ) | |
| v. | ) ) | No. 13 CR 7151 |
| JONATHAN PRIMM, | ) ) | Honorable |
| Petitioner-Appellant. | ) ) | Kenneth J. Wadas, Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Hyman and Justice Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held:*   We affirm where the Unlawful Possession of a Firearm statute does not violate the second amendment, and the circuit court did not improperly consider the conviction in aggravation.

¶ 2 Following a jury trial, Petitioner Jonathan Primm was convicted of 3 counts of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) of Darius Chambers. On direct appeal, this court vacated one of Jonathan's murder sentences under the one-act-one-crime rule, ordered the mittimus be corrected, and affirmed the circuit court's judgment. Jonathan initially filed a postconviction petition alleging a Brady violation, erroneous jury instructions, ineffective assistance of appellate counsel, and actual innocence. In January 2023, Jonathan filed a supplemental petition alleging constitutional violations of his second amendment rights and argued he should be resentenced because the circuit court improperly considered his "void" Unlawful Possession of a Firearm (UPF) conviction.

¶ 3 In January 2024, Jonathan only argued the claims in his second supplemental petition, and the circuit court granted the State's motion to dismiss. Jonathan raises two issues on appeal. He first argues that his 2009 UPF conviction should be vacated because (720 ILCS 5/24-3.1(a)(1) (West 2008)) it is unconstitutional. Next, Jonathan argues he should be resentenced because the circuit court improperly considered the UPF conviction in aggravation. For the foregoing reasons, we affirm.

¶ 4                                I. BACKGROUND

¶ 5 In October 2011, Petitioner Jonathan Primm lived with his aunt, uncle, and cousins near 79th Street and South Greenwood Avenue in Chicago. He was arrested and charged with 3 counts of first degree murder following an incident where four individuals including Jonathan[1], allegedly attacked two individuals at a bus stop near Greenwood Avenue.

---

[1] Due to sharing the same last name "Primm" we will refer to the "Primm" family members by their first name.

¶ 6    At trial, Jamira Primm, Jonathan's cousin, testified that around 3:00 a.m. on October 30, 2011, she awoke and saw three boys outside of the kitchen window. The window faced towards the 79th Street and Greenwood Avenue bus stop. Jamira stated that she remembered seeing the boys kicking a man lying on the ground. The boys finished and entered the house. She identified the boys as Donnte Kindle, Jonathan Primm, and Jabrill Gardner and stated there was one other individual with the group who went by the name "Blackness". Jamira identified "Blackness" as Antoine Ward.[2]

¶ 7    On cross examination, Jamira was questioned whether she saw her cousin Jonathan kicking and stomping anybody. She stated "everybody was out there. Everybody was out there doing something." On redirect examination, Jamira clarified that her cousin Jonathan wore a red hoodie before coming back into the house. She stated that Jonathan, "put on his hood" when he came inside after the attack.

¶ 8    Stephen Willis, a schoolteacher, testified that on October 30, 2011, he was out with friends for a Halloween party. He met Darius Chambers that night through his best friend Ronald Parker. After the party, around 2:00 a.m., Willis and Chambers walked down Greenwood Avenue towards the bus stop to go home. While waiting for the bus, one of the suspects came from across the street and started pacing back and forth behind Willis. As soon as the suspect crossed the street, two more people appeared. Willis stated, "All of a sudden a third person came so now it's four people, two to my left or [*sic*] Darius' left and two to my right." The suspect on the right of Willis asked to use his cell phone and he told him he did not have one.

_____

[2] Because witness testimony refers to these individuals by their first names — "Donnte Kindle", "Jabrill Gardner", and "Antoine Ward" — as their first names, we will use their first names for consistency.

¶ 9    Willis stated that he tried to give Chambers "a look like you know, bro, it's time to book it" but Chambers did not see him. Willis explained at that point, the suspects tried to attack him and Chambers. Willis was able to free himself and ran to get help. He ran to Parker's house and told Parker that he and Chambers had been attacked. Parker called 911 and Chicago police arrived on the scene.

¶ 10    Jalen Primm, Jonathan's cousin, testified that he was living near Greenwood and 79th Street on October 30, 2011. He was seven years old at the time. Around 3:00 a.m. he awoke after falling asleep on the couch in the living room. Jalen looked out the kitchen window and saw a man getting "beaten up. Down on the ground." He stated that four boys were "beating up the man" and the boys names were Jabrill, "Blackness", Donnte, and "Bojack." He stated that he could not remember "Blackness'" real name and that "Bojack" was Jonathan Primm. He knew Jonathan because he was his cousin.

¶ 11    Jalen explained that he saw Jonathan, Donnte, "Blackness", and Jabrill punching and kicking the man. He also saw Donnte and Jabrill chase a man that was running away. Jalen stated that after the attack, the four boys came back into the house. His parents had awakened, and his father called the police.

¶ 12    On cross examination, Jalen confirmed that he understood every question the State's attorney asked him on an advisory form that was read to him. He stated that he was not afraid, scared, or intimidated by the police officer who read him the advisory form. Jalen explained that he could see what was going on at the 79th and Greenwood bus stop even though he had just awakened, and it was late at night.

¶ 13   On redirect examination, Jalen stated that his brother Arnold Mitchell was in his room and not outside with Jonathan, Jabrill, Donnte, and Antoine. He explained that Mitchell never went outside when the others were beating up the man.

¶ 14   Shannon Primm, Jamira and Jalen's mother, testified that on October 30, 2011, she was awakened around 3:00 a.m. She was directed by her daughter to look out the window of her bedroom which faced the 79th and Greenwood bus stop. She saw a man lying on the sidewalk across the street with a white sheet and police were outside. Shannon's husband at the time, Jeffrey Primm, called the police. She stated that Antoine and Jabrill ran out the back door of the apartment when this happened and Jonathan and Donnte stayed seated on the couch. She remembered Jonathan wearing a red hoodie. Chicago police detained Jonathan and Donnte that night. The next morning, Shannon was cleaning and found a man's identification card. She called a detective, and the detective came and collected the identification card.

¶ 15   On cross examination, Shannon confirmed that she found a man's identification card in her cabinet while cleaning. She reiterated that when her husband Jeffrey stated he was going to call the police, Antoine and Jabrill ran out the back door while Donnte and Jonathan stayed seated on the couch.

¶ 16   Arnold Mitchell, Shannon's son, testified that on October 29, 2011, he and Antoine Ward tried to go to a holiday party but were denied entry because they were too young. He stated that Antoine's nickname was "Blackness." After being denied entry, he and Antoine went back to Mitchell's mother's house. When they arrived, Jonathan, Jabrill, and Donnte were at the house. He stated that Jonathan had been staying with his family for about a week or two at this time. Mitchell explained that Jonathan had known Jabrill and Antoine before he started staying with him and his mother but did not know Donnte.

5

¶ 17    Mitchell stated that he walked into the house and was hungry. He retrieved chili from the microwave and sat down in the living room to eat it. While eating, Mitchell was listening to a conversation between Jonathan, Donnte, and Jabrill. He stated that Jonathan was "saying something about 187." Mitchell explained that he thought a "187" was a robbery. He continued listening and eating his food. Mitchell noted that Jonathan also referred to "187" as "stain" which he also understood to be street terminology for a robbery. He stated, "He was just basically trying to get whoever wanted to go out with him and do what he was going to do." Mitchell did not want to be involved and went to his room to sleep. After Mitchell went to his room, Antoine, Jonathan, Jabrill, and Donnte were still in the living room. He did not know if they went along with Jonathan's plan.

¶ 18    Mitchell awoke around 3:00 a.m. to all the lights turned off in the house. He explained this was weird because usually all the lights would not be off. He saw his sister Jamira and his brother Jalen looking out the kitchen window. Mitchell looked out the kitchen window and saw a body lying on the sidewalk of 79th and Greenwood. He saw Donnte and Jonathan come in through the back door and go into the kitchen. Mitchell went back to his room because he "didn't want no part of what was going on." After going to his room, he stated that he remembered Antoine saying, "how much you got." He remembered somebody saying "not a lot" but he could not recognize the person's voice. He was questioned about his grand jury testimony where he testified that Jonathan said, "not a lot" and confirmed that was accurate.

¶ 19    On cross examination Mitchell stated that he knew Antoine, Jabrill, and Donnte for around seven years at the time of the incident. He admitted that Donnte, Antoine, and Jabrill were his friends rather than Jonathan's. Mitchell clarified that he awoke to use the restroom and noticed the lights were off. He went to the kitchen and looked out the window towards the Greenwood bus

stop and noticed police and a body positioned on the sidewalk. He also saw Donnte and Jonathan coming up the stairs at that time. After seeing this, Mitchell went back to his bedroom.

¶ 20    Dr. Joshua Akers, a forensic pathologist at the Cook County Medical Examiner's Office, testified that he conducted an autopsy on the body of Darius Chambers on October 31, 2011. Dr. Akers stated it was his opinion that the cause of death was "subarachnoid hemorrhage due to blunts [*sic*] force injuries to the head subsequent to an assault" and the manner of death was "homicide."

¶ 21    Chicago police officer Charles McClay testified that on October 30, 2011, around 3:00 a.m. he responded to a call around 79th Street and Greenwood for a battery in progress. When he arrived on scene he observed a male lying on the sidewalk unresponsive. After speaking with Willis and Marquitta Jones, he proceeded to a residence in the area. Once in the residence, he detained two individuals who matched the description given at the time. He learned the names of the two individuals were Donnte Kindle and Jonathan.

¶ 22    Juan Aguirre, an evidence technician for the Chicago Police Department, testified that on October 30, 2011, around 3:00 a.m., he was assigned to process the crime scene near 79th and Greenwood. He noted that Chambers left pocket seemed to be "partially turned out with some of the contents exposed."

¶ 23    Earl Parks, a detective with the Chicago Police Department, testified that on October 30, 2011, he received a homicide assignment around 79th and Greenwood. He stated that once he was back at the detective division, a photo array was arranged for Willis. Willis identified Antoine and Jabrill. Willis indicated to Parks that the two individuals he identified were a part of a group of four that attacked him and Chambers. Parks stated an arrest warrant was issued for Jonathan on October 23, 2012, and he later learned Jonathan was arrested.

¶ 24    Majdi Shalabi, a detective with the Chicago Police Department, testified that on March 18, 2013, he was working with the "US Marshals Great Lakes Regional Fugitive Task Force." At approximately 9:45 p.m. he went to an apartment building on the 6400 block of South Martin Luther King Drive in Chicago and arrested Jonathan because there was a warrant out for his arrest for first degree murder.

¶ 25    On January 25, 2018, a jury found Jonathan guilty of first degree murder. The court denied a motion for a new trial on December 10, 2018. On January 7, 2019, Jonathan was sentenced to 40 years in the Illinois Department of Corrections. The court considered Jonathan's prior criminal history. Jonathan was arrested and charged with Unlawful Possession of a Firearm on August 16, 2009. He pled guilty to the charge on April 9, 2009 and was sentenced to 18 months of probation. The court stated, "Here's a good example of a situation where someone was convicted of unlawful possession of a handgun, placed on probation, the probation was completed unsatisfactorily, and rehabilitative potential considered in that light to me indicates that the defendant may actually go out there and commit another violent [offense]." Jonathan filed a motion to reconsider. On February 8, 2019, the court denied the motion in part, stating, "I'm convinced based on what I heard at trial. . . If he's not characterized as the ringleader, he's the guy that really put this whole thing into motion and that's in part of reason why his sentence was higher than some of the codefendants."

¶ 26    On direct appeal, this court vacated one of Jonathan's murder sentences under the one-act-one-crime rule, ordered the mittimus be corrected, and affirmed the circuit court's judgment. See *People v. Primm*, 2021 IL App (1st) 190588-U, ¶ 65. Jonathan initially filed a postconviction petition alleging a Brady violation, erroneous jury instructions, ineffective assistance of appellate counsel, and actual innocence.

¶ 27    In January 2023, Jonathan filed a supplemental petition alleging constitutional violations of his second amendment rights and argued he should be resentenced because the circuit court improperly considered his "void" UPF conviction. In January 2024, Jonathan only argued the claims in his second supplemental petition and the circuit court granted the State's motion to dismiss Jonathan's post-conviction petition at the second stage. This appeal followed.

¶ 28                                    II. JURISDICTION

¶ 29    The circuit court of Cook County granted the State's motion to dismiss on January 9, 2024. Petitioner's notice of appeal was timely filed on January 9, 2024. Accordingly, this court has jurisdiction pursuant to Article VI, section 6, of the Illinois Constitution (Ill. Const., 1970, art. VI, § 6) and Supreme Court Rule 651(a) (eff. July 1, 2017).

¶ 30                                    III. ANALYSIS

¶ 31    On appeal from the second stage dismissal of his post-conviction petition, Petitioner argues that (1) Section 24-3.1(a)(1) of the Unlawful Possession of a Firearm (UPF) statute violates the second amendment facially and as applied to him because it is inconsistent with the nation's historical tradition of firearm regulation; and (2) his post-conviction petition substantially showed that his constitutional right to due process was violated where the circuit court considered in aggravation his prior "void" conviction for UPF.

¶ 32    The Post-Conviction Hearing Act (the Act) "provides a mechanism for criminal defendants to challenge their convictions or sentences based on a substantial violation of their rights under the federal or state constitutions." *People v. Morris*, 236 Ill. 2d 345, 354 (2010). A proceeding under the Act is a collateral proceeding and not an appeal from the defendant's conviction and sentence. *People v. English*, 2013 IL 112890, ¶ 21. The defendant must show he suffered a substantial deprivation of his federal or state constitutional rights. *People v. Caballero*, 228 Ill. 2d 79 (2008).

¶ 33    Pursuant to the Act, a postconviction proceeding has three distinct stages. 725 ILCS 5/122-1 *et. seq.* (West 2022); *People v. McMillen*, 2021 IL App (1st) 190442, ¶ 10. At the first stage, the defendant files a petition, and the circuit court determines whether it is frivolous or patently without merit. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). At the second stage, the court determines whether the petition and documentation filed make a substantial showing of a constitutional violation. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). We review the circuit court's second stage dismissal of a postconviction petition *de novo*. *Id*. at 388-389.

¶ 34                    A. UPF Unconstitutional on its Face and As Applied

¶ 35    Jonathan contends the UPF statute is unconstitutional on its face and as applied to him because it is inconsistent with the nation's historical tradition of firearm regulations. He specifically alleges that persons younger than 18 years old are included in "the people," and the historical record from the time period *Bruen* identified as relevant do not support the ban of concealable firearms by persons younger than 18. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

¶ 36    A person commits the offense of UPF when, "he is under 18 years of age and has in his possession any firearm of a size which may be concealed upon the person." 720 ILCS 5/24-3.1(a)(1) (West 2022).

¶ 37    The *Bruen* court set forth a two-prong test to determine the constitutionality of firearm regulations: (1) whether the conduct in question falls within the scope of the second amendment and (2) if it does, should the court assess whether the government's regulation is consistent with the nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 18-19.

¶ 38    An individual raising a constitutional challenge to a statute carries the heavy burden of rebutting the strong judicial presumption that statutes are constitutional and must clearly establish

that the statute violates the constitution. *People v. Rizzo*, 2016 IL 118599, ¶ 23. Courts have a duty to uphold the constitutionality of a statute whenever reasonably possible, determining any doubts in favor of validity. *Id*. A constitutional challenge to a statute may either be facial or as applied. *People v. Burns*, 2024 IL App (4th) 230428, ¶ 11. Whether a statute violates the constitution of the United States is a question of law, which we review *de novo*. *People v. Plank*, 2018 IL 122202, ¶ 10.

¶ 39    While facial and as-applied constitutional challenges are both intended to address institutional infirmities, they are not interchangeable. *People v. Thompson*, 2015 IL 118151, ¶ 36. A facial challenge requires the party to show the statute is unconstitutional under any set of facts, rendering the specific facts related to the party irrelevant. *Id*. Parties may raise a facial challenge at any time. *Id*. ¶ 32. The burden of proof on the challenger is heavy when presenting a facial constitutional challenge. *Rizzo*, 2016 IL 118599, ¶ 24. If there exists a situation in which the statute could be validly applied, a facial challenge will fail. *Id*.

¶ 40    An as-applied challenger has the burden of showing a constitutional violation arises from the application of the statute to a specific set of facts and circumstances set forth. *People v. Harris*, 2018 IL 121932, ¶ 38. Ordinarily, a defendant must present an as-applied challenge at trial to develop the record as it pertains to the specific set of facts and circumstances of his claim. *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 57. If all the facts and circumstances to decide the claim are already in the record, the as-applied challenge may be raised for the first time on appeal. *Id*.

¶ 41    We first note that our supreme court has previously rejected challenges to these same age-based restrictions on firearm possession and upheld the statutory provisions at issue. See *People v. Mosley*, 2015 IL 115872, ¶¶ 33-38; *People v. Aguilar*, 2013 IL 112116, ¶¶ 24-28. Though our

supreme court's decisions in *Mosley* and *Aguilar* were issued prior to *Bruen*, we do not find the decision in *Bruen* demands a different outcome.

¶ 42     In *Aguilar*, the Illinois Supreme Court specifically addressed the constitutionality of the UPF statute. *Aguilar*, 2013 IL 112116, ¶ 24. There, the defendant argued that the prohibition of persons under 18 years of age from possessing a firearm of a concealable size violated the second amendment because at the time the amendment was drafted and ratified, the right to keep and bear arms extended to persons 16 and 17 years of age. *Id*. ¶ 25. Our supreme court rejected defendant's argument and concluded that "possession of handguns by minors' is conduct that falls outside the scope of the second amendment's protection." *Id*.

¶ 43     In *Mosley*, our supreme court held that the restriction prohibiting persons under the age of 21 who were not engaged in lawful hunting activities from possessing firearms in the Aggravated Unlawful Use of a Weapon (AUUW) statute was constitutional. *Mosley*, 2015 IL 115872, ¶ 37. The court explained that the restriction was "both historically rooted and not a core conduct subject to second amendment protection" and the provisions of the statute provided "multiple exceptions and exemptions to protect the rights of law-abiding persons under the age of 21. *Id*.

¶ 44     The supreme court noted that several courts since *District of Columbia v. Heller*, 554 U.S. 570 (2008), have determined that "the possession of handguns by minors is conduct that falls outside the scope of the second amendment's protection." *Id*. ¶ 27. The court explained that "nothing like a right for minors to own and possess firearms has existed at any time in this nation's history" and "laws banning the juvenile possession of firearms have been commonplace for almost 150 years." *Id*. Thus, according to our supreme court, possession of handguns by minors is conduct that is not within the scope of the second amendment's protection. *Id*. Accordingly, we reject Jonathan's second amendment challenge to the age-based restriction in the UPF statute because

the law, as it applies to Jonathan, does not violate any right protected by the second amendment, and therefore cannot be facially unconstitutional based on the second amendment. *Id*. ¶ 27-28.

¶ 45        B. *Bruen* Altered Second Amendment Challenges to Gun Regulations

¶ 46    Petitioner argues the supreme court's decision in *Bruen* altered the burden of persuasion and the substantive standard for second amendment challenges to gun regulations. Specifically, he argues that (1) by eliminating means-end scrutiny, the Court avoided consideration of the State's interest in regulating firearms in a particular way, or of the regulation's ability to protect that interest, and post-*Bruen*, only historical analysis should guide this court's second amendment inquiries and (2) the *Bruen* court made clear that the State bears the burden of making a sufficient showing of historical analogues to a challenged regulation.

¶ 47    In *Bruen*, the Court had to determine the constitutionality of New York's firearm licensing regime which required applicants to establish "proper cause" existed for licensure. *Bruen*, 597 U.S. at 12. The Court held the regime was unconstitutional and explained that the "proper cause" requirement granted the government an unreasonable level of discretion to deny a license to applicants seeking to possess firearms out of a generalized desire for self-defense. *Id*. at 70. The Court also concluded that the test used since *Heller* was "one step too many" and rejected the means-end analysis regarding second amendment challenges. *Id*. at 2.

¶ 48    In *Aguilar* and *Mosley*, our supreme court concluded that the second step, the means-end scrutiny analysis, need not be addressed because age-based restrictions fell outside the scope of the second amendment. *Aguilar*, 2013 IL 112116, ¶ 27; *Mosley*, 2015 IL 115872, ¶ 37. It follows that such restrictions would also fail the 1st prong of the *Bruen* test, meaning, contrary to petitioner's assertions, the *Bruen* test cannot be classified as "altering the burden of persuasion and substantive standard for second amendment challenges to gun regulations" regarding age-based

13

restrictions for persons under 18 in Illinois. Moreover, even if the issue did reach the second prong of *Bruen*, our supreme court has already answered the second step in the *Bruen* analysis. The court addressed the historical roots of age-based restrictions regarding the second amendment and held there was historical record placing restrictions on minors' access to firearms that persisted well beyond the Founding era. See *Mosley*, 2015 IL 115872; *Aguilar*, 2013 IL 112116; *People v. Thompson*, 2024 IL App (1st) 221031.

¶ 49                          C. Prior Conviction for UPF Considered in Aggravation

¶ 50   Finally, Petitioner argues that his constitutional right to due process was violated where the circuit court, in imposing a 40-year prison sentence upon him for first-degree murder, considered in aggravation his "constitutionally invalid" prior conviction for UPF. We find petitioner has not made a substantial showing that his constitutional right to due process was violated because, as determined above, our supreme court has already decided that possession of handguns by minors is conduct that is not within the scope of the second amendment's protection. See *Mosley*, 2015 IL 115872; *Aguilar*, 2013 IL 112116. Even if we were to find otherwise, the record supports the contention that the circuit court's rationale for the sentencing was that Petitioner was the "ringleader", and the sentencing was proportionate from that aspect.

¶ 51                                   IV. CONCLUSION

¶ 52   For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 53   Affirmed.